[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-11952

_____

D.C. Docket No. 2:10-cr-00186-AKK-JEO-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

MAURICE WILLIAM CAMPBELL, JR.,
a.k.a. Bill Campbell,
a.k.a. Sir William,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(September 3, 2014)

Before ED CARNES, Chief Judge, TJOFLAT, Circuit Judge, and MARRA,[*] District Judge.

TJOFLAT, Circuit Judge:

In this case, Maurice William Campbell, Jr., and several co-conspirators, created, and successfully executed, a scheme to defraud the State of Alabama to the tune of several million dollars. The scheme was ultimately uncovered, and the co-conspirators were separately indicted by a Northern District of Alabama grand jury. Campbell was charged with wire fraud, mail fraud, money laundering, engaging in monetary transactions in criminally derived property, and conspiring to commit those offenses.

Campbell pled not guilty and stood trial. Several of his co-conspirators, having pled guilty, testified for the prosecution. The jury believed what they had to say and found Campbell guilty as charged. At sentencing, the District Court departed downward from the sentence range the Sentencing Guidelines prescribed, 262 to 327 months' confinement, and imposed prison sentences totaling 188 months. The court also ordered him to pay $5.9 million to the State of Alabama in the form of restitution.[1]

---

[*] Honorable Kenneth A. Marra, United States District Judge for the Southern District of Florida, sitting by designation.

[1] The court also ordered that Campbell forfeit to the United States $7.9 million.

2

Campbell appeals his convictions and sentences.  He appeals his convictions on the ground that the Government failed to prove his guilt beyond a reasonable doubt.[2]  He appeals his sentences on the ground that they are procedurally and substantively unreasonable.  See Gall v. United States, 552 U.S. 38, 51, 128 S. Ct. 586, 597, 169 L. Ed. 2d 445 (2007).  We find no merit in Campbell's challenges to his convictions, and therefore affirm them, because the evidence of guilt, which we set out in considerable detail infra, was overwhelming.  We also affirm his sentences, finding no procedural or substantive error.

I.

Campbell's convictions arose from his conduct as the State Director of the Alabama Small Business Development Consortium (the "ASBDC").  The ASBDC was an affiliation of small business development centers housed within Alabama public universities.  These development centers provided workforce training, business education, and other assistance to Alabama businesses.  The ASBDC's central office obtained funding from various sources and distributed that money to the member development centers.  The central office also put on educational

---

[2] Campbell therefore asks that we instruct the District Court, on remand, to enter an order of acquittal on all counts of the indictment.  Alternatively, he seeks a new trial on the grounds that his attorney's performance was constitutionally ineffective under the Sixth Amendment because his attorney labored under a conflict of interest.  We do not consider this argument.  This court will not "consider claims of ineffective assistance of counsel raised on direct appeal where the district court did not entertain the claim nor develop a factual record." United States v. Bender, 290 F.3d 1279, 1284 (11th Cir. 2002).

3

seminars, published educational material, and generally promoted the work being done by its members.

Campbell was hired as the State Director of the ASBDC in 2003. At the time, the ASBDC had been zeroed out of the state budget, and so Campbell set to lobbying members of the Alabama Legislature and the Governor's Office on the ASBDC's behalf. His efforts proved fruitful; over the course of his tenure, Campbell secured approximately $7.3 million from the State. But, thanks to Campbell's efforts, the ASBDC did not receive that money directly; instead, state funds were routed through a private nonprofit corporation, the Alabama Small Business Institute of Commerce (the "Institute").

Campbell incorporated the Institute in February 2005—after he secured the promise of state funding for the ASBDC—as a 501(c)(3) corporation with the stated purpose of "enhanc[ing] economic development, increas[ing] employment and reduc[ing] business failure in Alabama through business education and workforce training." Campbell then asked Alabama officials that the Institute be designated to receive the state money on the ASBDC's behalf. He told the Governor's Office that the Institute was just a conduit for the ASBDC and that channeling the funds through the Institute would make it easier to obtain matching federal money and would allow him to keep the ASBDC's various funding sources separate. He did not explain the requested change to the Legislature; the then-

Chairman of the House Education Appropriations Committee testified at Campbell's trial that he assumed the Institute and the ASBDC were the same thing. Trusting Campbell, the Alabama officials agreed to designate the Institute as the entity that would receive state funds on behalf of the ASBDC.

The Institute leased separate office space from the ASBDC's central office, was located in a different city, hired its own employees, and held its own accounts. Most importantly, because the Institute was a private nonprofit rather than a state entity, its accounts were not subject to audit by the Alabama Department of Examiners of Public Accounts. Between 2005 and 2010, Campbell and several co-conspirators took advantage of this fact.

From the beginning, Campbell treated the Institute's money as his own. He used the money to pay for, among other things, meals, clothing, cars, and vacations. He hired two employees for the Institute, gave them Institute debit cards, and told them that they could spend the money however they wanted. And he gave debit cards to the ASBDC's director of public relations and an Institute board member with similar instructions. Campbell's co-conspirators—who pled guilty to various offenses committed during the execution of the scheme and testified against him at trial—confirmed that, with Campbell's permission, they all used Institute funds to pay for vacations, shopping trips, jewelry, meals, groceries, gas, and other personal expenses. Perhaps the most salacious example of the self-

indulgence is the money Campbell spent entertaining a group of young women he called the "Little Sisters."  The Little Sisters were a group of college-age girls with whom Campbell liked to spend time.  He ostensibly hired the girls to work various events hosted by the ASBDC, sometimes paying them up to $100 for an hour of passing out pamphlets or a few minutes spent setting up a display board.  He also paid the girls to attend meals and non-ASBDC events with him, bought their meals and drinks, took them on shopping trips and beach vacations, and gave them gifts, including bracelets engraved with "Lil Sis" and "Sir William" (his nickname)—all paid for with Institute funds.

In 2008 Campbell started funneling money from the Institute's accounts into outside accounts controlled by him or his co-conspirators.  The vehicle for these transfers was a lease for "office space" in a retirement home.  Campbell was the executive director of the retirement home, and at his direction the Institute paid $5,000 and then $6,000 per month for a bedroom in a residential apartment.  The Institute's rent checks were deposited in an account in the retirement facility's name, which was controlled by Campbell.  From there the "rent" money went to other accounts controlled by either Campbell or his co-conspirators.  Some of this money was eventually "paid" back to Campbell as part of his compensation as director of the retirement facility.

Despite all this graft, some Institute money made its way into the hands of the ASBDC-member development centers.  Of the $7.3 million received by the Institute, approximately $1.4 million was distributed to the development centers— around 20 percent.  The Government did not present the District Court with an exact accounting of how all of the remaining $5.9 million was spent, and that failure lies at the heart of this appeal.

## II.

The Institute's loose spending was eventually detected, and after a federal investigation, a grand jury for the Northern District of Alabama returned a one-count indictment in May 2010, charging Campbell with aiding and abetting mail fraud, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2.  In March 2011, the grand jury returned a ninety-six count superseding indictment, which charged Campbell with three counts of aiding and abetting mail fraud, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2 (Counts 1, 59, and 60); one count of conspiracy to commit mail fraud, wire fraud, money laundering, and engaging in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 371 (Count 2); fifty-six counts of aiding and abetting wire fraud, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2 (Counts 3–58); thirty-one counts of aiding and abetting money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and 18 U.S.C. § 2 (Counts 61–91); and five counts of aiding and abetting engaging in monetary

transactions in criminally derived property, in violation of 18 U.S.C. § 1957 and 18 U.S.C. § 2 (Counts 92–96).

During an eight-day trial, the Government presented testimony by Alabama officials, Campbell's co-conspirators, some of the Little Sisters, and an IRS agent who examined the Institute's accounts. The Government also submitted into evidence receipts from purchases made with Institute funds, bank records for each of the Institute's accounts, and some of the Institute's business records. Campbell did not call any defense witnesses after the Government rested its case in chief. On November 17, 2011, the jury returned a guilty verdict on all ninety-six counts.

The presentence investigation report ("PSI") calculated Campbell's sentence range as follows: The base offense level for Campbell's crimes was 7. See U.S.S.G. §§ 2S1.1(a)(1); 2B1.1(a)(1) (2011).[3] This base level was increased by 32 based on the following special offense characteristics: a 20-level increase because the loss amount was more than $7 million but less than $20 million, id. § 2B1.1(b)(1)(K); a 2-level increase because Campbell was acting on behalf of a charitable organization, id. § 2B1.1(b)(9)(A); a 2-level increase because Campbell

---

[3] The PSI grouped all counts together and applied the sentencing guideline for the count that would result in the highest sentencing level. See U.S.S.G. §§ 3D1.2, 3D1.3. In Campbell's case, the money laundering charges under 18 U.S.C. §§ 1956 and 1957, which corresponded to sentencing guideline § 2S1.1, resulted in the highest sentencing level. Section 2S1.1(a)(1) provides that the base offense level for money laundering is the offense level of the underlying offense that produced the laundered money. Here, the underlying offense is the wire fraud and mail fraud charges, in violation of 18 U.S.C. §§ 1341 at 1343. The guideline section associated with those charges is § 2B1.1. Section 2B1.1(a)(1) provided Campbell's base offense level of 7.

8

was convicted of money laundering under 18 U.S.C. § 1956, id. § 2S1.1(b)(2)(B); a 2-level increase because the offense involved sophisticated money laundering, id. § 2S1.1(b)(3); a 2-level increase because Campbell abused a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense, id. § 3B1.3; and a 4-level increase because Campbell was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, id. § 3B1.1(a).  This total offense level of 39, when combined with Campbell's criminal history category of I, yielded a Guidelines range of 262 to 327 months.  Id. ch. 5, pt. A (sentencing table).

In his appeal, Campbell challenges the amount of loss calculation under § 2B1.1(b)(1), and so we focus our attention principally on the arguments presented to the District Court with respect to the application of this section of the Guidelines.[4]  Section 2B1.1(b)(1) provides a series of increasing offense level enhancements based on the amount of loss attributable to a defendant's fraud:

| Loss (Apply the Greatest) | Increase in Level |
| --- | --- |
| (A) $5,000 or less | no increase |
| (B) More than $5,000 | add 2 |
| (C) More than $10,000 | add 4 |
| (D) More than $30,000 | add 6 |
| (E) More than $70,000 | add 8 |

[4] Campbell also argues that the District Court's application of U.S.S.G. § 3B1.1(a) (enhancement for being an organizer or leader of a criminal activity) was erroneous.  That argument is baseless.

(F) More than $120,000          add 10

(G) More than $200,000          add 12

(H) More than $400,000          add 14

(I) More than $1,000,000          add 16

(J) More than $2,500,000          add 18

(K) More than $7,000,000          add 20

(L) More than $20,000,000          add 22

(M) More than $50,000,000          add 24

(N) More than $100,000,000          add 26

(O) More than $200,000,000          add 28

(P) More than $400,000,000          add 30.

U.S.S.G. § 2B1.1(b)(1).  As is evident from its application of § 2B1.1(b)(1), the

PSI used the total amount of state money received by the Institute—$7.3 million—

as the loss caused by Campbell's scheme.  Accordingly, the PSI added 20 levels to

Campbell's offense level, corresponding to a loss greater than $7 million but less

than $20 million.

The Government agreed with the premise underlying the $7.3 million

starting point—that all money received by the Institute was a loss to the State of

Alabama.  See Gov't Sent. Mem., Doc. 101, at 23 ("[T]he Institute was a useless

private 'middleman' for fulfilling the mission of the [ASBDC].  In truth and fact,

the Institute was formed to make State money, 'my money'—to quote the

Defendant.").  However, the Government submitted that Campbell should receive a

credit for the $1.4 million that was distributed to ASBDC members,[5] leaving a

total loss of $5.9 million, which corresponds to an 18-level increase under §

2B1.1(b)(1) (for a loss between $2.5 and $7 million).[6]

Campbell objected to the PSI's and the Government's loss calculations,

claiming that he should have only received a 12-level increase under

§ 2B1.1(b)(1), which corresponds to a loss amount between $200,000 and

$400,000.  Campbell reached this range by calculating the amount he gained from

the fraud rather than the amount the State of Alabama lost.  The commentary to

§ 2B1.1 provides that, when the court cannot accurately estimate the victim's loss,

it can instead use the defendant's gain for purposes of calculating the § 2B1.1(b)(1)

offense level increase.  U.S.S.G. § 2B1.1 cmt. n.3(B).  Campbell contended that

the Institute was a legitimate nonprofit that was actively engaged in promoting

Alabama small businesses, and while some of the funds were admittedly misspent,

that should not convert 100 percent of the Institute's funding into a "loss" to the

State of Alabama.  In other words, the fraud, in Campbell's view, was a matter of

degree—a bit too much spent on meals and liquor here, a few improper travel and

---

[5] Application note 3(E)(i) to § 2B1.1 provides that the loss amount should be credited to account for the value of any money returned or services rendered to the victim.

[6] The Government still calculated Campbell's total offense level at 39 because it sought a two-level enhancement for "sophisticated means" used to perpetrate fraud, see U.S.S.G. § 2B1.1(b)(10)(C)—an enhancement that was not provided for in the original PSI.  The parties agree that an addendum to the original PSI incorporated, over the defendant's objection, the Government's two changes—still reaching an offense level of 39 and a Guidelines range of 262 to 327 months.

entertainment expenses there.  As such, Campbell submitted that it would be practically impossible to tease out what portion of the Institute's spending was illegitimate.  And so Campbell proposed that the court use his gain instead—a number he calculated at approximately $300,000, which included the Institute's "rent" payments ($237,000), improper expenditures listed in the superseding indictment ($26,000), and checks written to the "Little Sisters" ($35,000).  As noted, a $300,000 loss corresponds to a 12-level increase under § 2B1.1(b)(1).

In the alternative, if the court accepted the Government's premise that all state money received by the Institute was a loss to the State, Campbell asked for additional credit against that loss (beyond the $1.4 million distributed to ASBDC members) for "undisputedly legitimate" expenses such as "lobbying fees and expenses, attorney's fees, fundraising expenses, legitimate travel expenses, program expenditures, training expenses, salaries and associated taxes, vehicle business related use, [and] appropriate and proper entertainment expenses." Campbell Sent. Mem., Doc. 100, at 9.

As the Supreme Court has explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." Gall, 552 U.S. at 49, 128 S. Ct. at 596.  "When a defendant challenges one of the factual bases of his sentence . . . the Government has the burden of establishing the disputed fact by a preponderance of the evidence."  United States v. Rodriguez,

732 F.3d 1299, 1305 (11th Cir. 2013) (alteration in original) (quotation marks omitted).  Once the Guidelines range is fixed the sentencing court then "giv[es] both parties an opportunity to argue for whatever sentence [whether inside or outside the Guidelines range] they deem appropriate."  Gall, 552 U.S. at 49, 128 S. Ct. at 596.  Using the Guidelines range as the benchmark, the court then weighs "all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party."[7]  Id. at 49–50, 128 S. Ct. at 596.  "If [it] decides that an outside-Guidelines sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  Id. at 50, 128 S. Ct. at 597.

We begin with the District Court's application of the Guidelines—in particular, § 2B1.1(b)(1).  During the sentencing hearing, the Government set to proving that the State suffered at least a $2.5 million loss by arguing that the Institute "was a private nonprofit middleman and was an utterly unnecessary conduit of state funding"—"the real purpose of the Institute . . . was to make the

---

[7] Section 3553 directs a court to impose a sentence "sufficient, but not greater than necessary" to achieve the following sentencing objectives:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

state's money Sir William's money." Sent. Tr., Doc. 123, at 27, 28–29.  To wit, the Institute distributed only 20 percent of the state funds to ASBDC members, "[t]he Institute did not raise funds from other sources or obtain matching federal funds as promised," "[t]he Institute did not sponsor its own programming or offer services," and, apart from the 20 percent, there was "no other evidence in the record that actual expenditures were made on behalf of member institutions or to the benefit of the State of Alabama or the stated mission of the [ASBDC]."  Id. at 26, 16.  In short, the Government's theory was that the Institute did not provide any useful services to the State of Alabama.  Its sole purpose was to "enable[] a bunch of private individuals to take state money and make personal profit from it.  And that's why the entirety counts as a loss to the State of Alabama."  Id. at 29.

In response to Campbell's request that the loss amount be credited for the Institute's "legitimate" operating expenses, the Government pointed out that many of these expenses were part and parcel of Campbell's scheme to defraud the State of money.  For example, the Institute's accountants reviewed fraudulent records (and Campbell fired an accountant who began asking too many questions), the Institute's attorney prepared the Institute's articles of incorporation and drafted the fraudulent lease with the retirement home, and the Institute's lobbyists helped secure more money for Campbell and his co-conspirators to spend.  As the

14

Government put it, those expenses were "simply part of creating the cover for the defendant's conduct." Id. at 36.

As to Campbell's claim that he should be credited for the portion of his travel, entertainment, salary, vehicle costs, etc., that was "appropriate and proper," the Government contended that, while it had not included every illegitimate expenditure in the indictment (if it had, it would have included thousands of counts), all of the expenditures made by Campbell and his co-conspirators "were part of the larger scheme and artifice to defraud." Sent. Tr., Doc. 123, at 37. The Government gave a few examples of expenses that were not charged in the indictment: $700-a-night hotel rooms at the Ritz Carlton, a $2,500 charge to ship Campbell's luggage, costs associated with a luxury SUV for Campbell, a personal driver and a limousine when he traveled, and beach vacations for the Institute's employees—but the Government did not set to proving the illegitimacy of each and every transaction made with Institute money. The Government's bottom line was that "the State of Alabama did not reap a dime of benefit from [any of the Institute's] expenditures. And the victim here, the State of Alabama, has to reap a benefit for a credit to be given." Id. at 35–36.

With the benefit of the parties' arguments during the sentencing hearing and the evidence and testimony submitted during trial, the District Court concluded

that the Government had satisfied its burden of showing a loss in excess of $2.5

million.  It announced its decision as follows:

> [T]he court does not believe it needs to get to the gain analysis.
> That's according to the application notes, in particular, 3(B) of section
> 2B1.1 of the sentencing guidelines: "The court shall use the gain that
> resulted from the offense as an alternative measure of loss only if
> there is a loss but it reasonably cannot be determined."
>
> In this case, the court believes that the loss can reasonably be
> determined and in fact has been done in this case based on both the
> trial evidence and the arguments that have been presented here today.
> The court believes that the government has met its burden of
> establishing a loss of at least $2.5 million in this case.
>
> Therefore, the court agrees . . . that the appropriate increase is 18 and
> not . . . the level 12 that the defendant is asking for based on [his]
> numbers of $200,000 to $400,000.

Id. at 65.  The court also denied Campbell's request for credits against the

calculated loss:

> Based on the trial evidence, it's clear that there is at least sufficient
> evidence in the record for the government to meet . . . its burden of
> proof in this case to establish that a lot of these professional entities
> that were being used [(i.e., the accountants, lawyer, and lobbyists)]
> played some role in perpetuating the scheme and the crime against the
> state.

Id. at 66.  The court went on to reject all of Campbell's other objections to the

PSI's Guidelines sentence range and, thus, concluded that Campbell's total offense

level was 39 and the Guidelines range was 262 to 327 months.[8]

---

[8] As explained in note 6, supra, an addendum to the PSI adopted the Government's 18-level increase for the loss amount and the two-level increase for "sophisticated means," resulting in a total offense level of 39 and the same recommended sentence range as in the original PSI.

16

Campbell requested a departure pursuant to note 19 of the § 2B1.1 comments, which explains that "[t]here may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." U.S.S.G. § 2B1.1 cmt. n.19(C). In support of such a downward departure, Campbell claimed that the amount of loss was not an appropriate proxy for his culpability, that an inside-Guidelines sentence for him would be disproportionate to similar white-collar crimes, and that part of the loss was caused by expenditures made by the Institute employees, not him.

Campbell also asked that the District Court sentence him to a below-Guidelines sentence, based on the 18 U.S.C. § 3553(a) sentencing factors, to a sentence between 48 to 60 months. To support this variance, Campbell asked the court to consider, among other factors, his age (he was 60 years old at the time of sentencing) and his history of community service (which was well attested to in letters submitted to the court and testimony during the sentencing hearing).

The court declined to grant a departure under the Guidelines but did grant a variance pursuant to the § 3553(a) sentencing factors. The court imposed a total term of imprisonment of 188 months, relying on, among other things, Campbell's "life of service and his compassion for his family but, more importantly for the court, for his fellow man as well." Sent. Tr., Doc. 123, at 135. The court also

17

ordered that Campbell pay $5.9 million in restitution to the State of Alabama.

After announcing Campbell's sentence, the court explained that "the sentence

would have been the same regardless of how the guidelines issues that we dealt

with earlier had been resolved in this case."[9] Id. at 136.

### III.

The Supreme Court has provided the following framework for our review of

a district court's sentence:

> [The court of appeals] must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range.
>
> Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard. When conducting this review, the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range.

Gall, 552 U.S. at 51, 128 S. Ct. at 597.  In carrying out this task, we review a

district court's interpretation and application of the Sentencing Guidelines de novo,

---

[9] Given this statement, the Government asserts that even if the District Court erred in its application of the Guidelines, any error was harmless. See United States v. Tampas, 493 F.3d 1291, 1305 (11th Cir. 2007) ("[W]here the district court would have imposed the same sentence regardless of the Guidelines' recommendations on the amount of loss, any error in its loss calculation is harmless.").  Because we conclude that the District Court correctly applied § 2B1.1(b)(1), we need not address this argument.

and we review its findings of fact for clear error.  United States v. Maxwell, 579 F.3d 1282, 1305 (11th Cir. 2009).

Only one of Campbell's challenges to his sentences merits further discussion: his argument that the District Court erred in calculating the amount of loss caused by his scheme under § 2B1.1(b)(1) of the United States Sentencing Guidelines.  Campbell argues that the District Court erred in finding that the amount of loss caused by his fraud exceeded $2.5 million.  For reasons explained below, we reject his argument and affirm Campbell's sentences.[10]

A.

Under the Sentencing Guidelines' approach to economic crime, the amount of financial loss attributable to a defendant's crime serves as a proxy for "the seriousness of the offense and the defendant's relative culpability."  U.S.S.G. § 2B1.1 cmt. background.  Given the nature of such crimes, the financial damage done may often be difficult to calculate with precision; accordingly, the Sentencing

---

[10] Campbell also filed a motion to stay the appeal and to remand the case to the District Court for a jury determination on the applicability of several sentencing enhancements in light of the Supreme Court's decision in Alleyne v. United States, 570 U.S. ___, 113 S.Ct. 2151, 186 L.Ed.2d 314 (2013).  We ordered that motion be carried with the case.  Alleyne held that any fact that increases a mandatory minimum sentence is an element of the crime that must be submitted to a jury and found beyond a reasonable doubt.  Id. at 2163.  Campbell argues from this holding that all sentencing enhancements are elements of the crime that a jury must decide.  We have already had occasion to address this issue: after Alleyne, "a district court may continue to make guidelines calculations based upon judicial fact findings and may enhance a sentence—so long as its findings do not increase the statutory maximum or minimum authorized by facts determined in a guilty plea or jury verdict."  United States v. Charles, ___ F.3d ___, 2014 WL 3031267, at *3 (11th Cir. 2014).  The motion is denied.

Guidelines only require district courts to make "a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n.3(C). If, in the sentencing court's assessment, that calculation under- or overestimates the seriousness of the offense (e.g., in cases where the crime caused substantial nonmonetary harm or created the risk of much greater financial losses), then the court may grant an upward or downward departure as needed. See id. cmt. n.19.

The Guidelines provide some general principles to guide the calculation of the loss amount, which we lay out below, but the appropriate method for estimating loss in any given case is highly fact-dependent, and accordingly, district judges are entitled to considerable leeway in choosing how to go about this task. As this court has explained before, "[f]raud is conjured in numerous variations and that should be considered when choosing a calculation methodology for the harm intended or caused." United States v. Gupta, 463 F.3d 1182, 1199 (11th Cir. 2006). "The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1 cmt. n.3(C). The district court is not altogether unfettered in calculating the loss amount, though—whatever methodology it chooses, the court must "support its loss calculation with reliable and specific evidence." United States v. Munoz, 430 F.3d 1357, 1370 (11th Cir. 2005). We will overturn a court's loss calculation under the

clear-error standard where "we are left with a definite and firm conviction that a mistake has been committed." See United States v. Crawford, 407 F.3d 1174, 1177 (11th Cir. 2005) (quotation marks omitted).

The Guidelines define "loss" as "the greater of actual or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). Actual loss is the relevant measure in this case and is defined as the "reasonably foreseeable pecuniary harm that resulted from the offense." Id. cmt. n.3(A)(i). Reasonably foreseeable pecuniary harm can include losses caused by co-conspirators, United States v. Hunter, 323 F.3d 1314, 1319 (11th Cir. 2003),[11] and is not limited to the harm caused by the conduct charged in the indictment, United States v. Rodriguez, 751 F.3d 1244, 1256 (11th Cir. 2014).

If the defendant returned any money to the victim or rendered any legitimate services to the victim before the fraud was detected, the loss amount must be reduced by the fair market value of the returned money or the services rendered. U.S.S.G. § 2B1.1 cmt. n.3(E)(i). This "credit" accounts for the fact that "value may be rendered even amid fraudulent conduct." United States v. Sayakhom, 186 F.3d 928, 946 (9th Cir. 1999) (quotation marks omitted). As the Sentencing Commission explained when it adopted this "net loss" approach, "the offender who

---

[11] Hunter dealt with loss calculations under § 2F1.1 of the 1998 Sentencing Guidelines. Section 2F1.1 was consolidated with § 2B1.1 in 2001; this consolidation did not materially change the amount-of-loss rules, and courts have continued to apply the case law developed under § 2F1.1 in applying § 2B1.1. See United States v. Maxwell, 579 F.3d 1282, 1305 n.8 (11th Cir. 2009).

transfers something of value to the victim(s) generally is committing a less serious offense than an offender who does not." U.S. Sentencing Guidelines Manual, app. C, vol. II, amend. 617, at 183 (2003). In line with this purpose, courts have held that a fraudster may not receive credit for value that is provided to his victims for the sole purpose of enabling him to conceal or perpetuate his scheme, see United States v. Orton, 73 F.3d 331, 334 (11th Cir. 1996); United States v. Blitz, 151 F.3d 1002, 1012 (9th Cir. 1998), nor may he deduct the costs he incurred in running a fraudulent scheme, see United States v. Craiglow, 432 F.3d 816, 820 (8th Cir. 2005); United States v. Marvin, 28 F.3d 663, 665 (7th Cir. 1994).

### B.

In Campbell's case, the $5.5 million gap between the parties' loss numbers is attributable to a factual dispute over the legitimacy of the Institute and a legal dispute over what the Government is required to prove in order to establish a loss amount under § 2B1.1(b)(1).

We begin with the factual disagreement. Most of Campbell's arguments attacking the Government's and District Court's loss number rest on a narrative that has been thoroughly debunked by the evidence presented at trial. Campbell asserts on appeal that he "borrowed" all of the state money with every intention of using it "for lawful and honorable purposes"; he simply "made some questionable decisions in regard to how he spent a small fraction of the sums." Appellant Br., at

22

14. Building on that premise, Campbell avows that "there were intended benefits to state agencies and others through workforce development, and that many agencies and others did in fact gain from Mr. Campbell's fundraising efforts and subsequent development work. The extent to which those goals were achieved is the only dispute." Id. at 31.

In effect, Campbell seeks to analogize his conduct to billing fraud—i.e., where a defendant provides legitimate services to the victim but then fraudulently charges the victim more than those services were worth.[12] In such cases, the pecuniary harm suffered by the victim is the difference between the amount billed and the value of the legitimate services rendered. See, e.g., United States v. Klein, 543 F.3d 206, 213–14 (5th Cir. 2008). Campbell, in effect, suggests that each transaction made with Institute money should be treated as a separate "billing" because the State received a little bit of benefit from all his dinners, "entertainment expenses," travel costs, and "contract labor" expenditures (i.e., the Little Sisters)—since they were all ultimately intended to benefit the ASBDC. He concedes that he might have "overbilled" in some instances, but nevertheless asserts that he provided a benefit that must be accounted for. Campbell takes this argument one step further, though. Because of the incremental nature and lengthy duration of his "overbilling," it would be impossible now to go back and unravel every transaction

---

[12] Campbell never articulates his argument in this manner, but we find the analogy useful in describing the gist of how he thinks the District Court should have treated his case.

23

made with Institute money to disentangle the legitimate conduct from the fraudulent.

The District Court rejected this approach and so do we. First, the record does not support Campbell's "pure heart, empty mind" narrative. In finding Campbell guilty of the first mail fraud count, which stemmed from the Institute's receipt of the first $1.2 million in state funds, the jury necessarily concluded that Campbell intended to defraud the State of Alabama from the outset. See United States v. Bradley, 644 F.3d 1213, 1238 (11th Cir. 2011) (explaining that, to prove mail fraud or wire fraud, the Government must prove that the defendant "intentionally participate[d] in a scheme or artifice to defraud another of money or property" (quoting United States v. Ward, 486 F.3d 1212, 1222 (11th Cir. 2007))). Likewise, in returning a guilty verdict of 36 counts of money laundering under 18 U.S.C. §§ 1956 and 1957, the jury concluded that the Institute's money was "dirty money" (in this case, because it was fraudulently procured) before Campbell started smuggling it out of the Institute accounts. See United States v. Christo, 129 F.3d 578, 579–08 (11th Cir. 1997) (explaining that money laundering requires the laundered funds to already be the product of a completed crime).

In finding Campbell guilty of 56 counts of wire fraud for purchases made with Institute debit cards, the jury rejected Campbell's theory that he was just a little negligent in the amounts he spent on otherwise beneficial activities. See

24

Bradley, supra.  And in adjudging Campbell guilty of conspiracy under 18 U.S.C. § 371, the jury rejected Campbell's supposition that Campbell merely "okayed a few questionable purchases" made by the Institute and ASDBC employees, Appellant Br. at 14, instead finding that Campbell and his associates were engaged in an fraudulent enterprise to convert Alabama's money to their own personal use. These findings were amply supported by evidence submitted at trial, including testimony that Campbell referred to the Institute funds as "Sir William's play money" and his "savings account," that he channeled money into various accounts "so that prying eyes can't look at it," that he recruited his co-conspirators by promising that the Institute would allow everyone "to make more money," and that he grew angry when anyone questioned his use of the Institute's money.

The Government's position—that the Institute was a sham organization which served no legitimate purpose—finds ample support in the record.  Even if we accept arguendo that the Institute occasionally used some of the state money to perform functions that had previously been performed by the ASBDC state office (e.g., to promote ASBDC members' work, host seminars, or publish educational material), there was no valid reason for incorporating the Institute as a separate nonprofit entity and then funneling the state funds through it.  When he was lobbying state officials for money, Campbell told them that using the Institute as a receiving entity for the ASBDC would allow him to more easily obtain matching

25

funds and keep the ASBDC's various funding sources separate.  And yet, the Institute never obtained any matching federal funds; the only other funding it received, apart from the $7.3 million from the State, was $75,000 in private donations made by FedEx and Intuit (making up approximately one percent of the Institute's total funding); and only 20 percent of the state funding ever made its way into the hands of ASBDC members.

The reality is that Campbell created the Institute and inserted it into the ASBDC's funding stream for the sole purpose of allowing him to conceal state funds from state accountants and thus enable him and his co-conspirators to use the money as they saw fit.  Accordingly, to say that the loss suffered by the State was only incremental—that Campbell's fraud only nibbled at the edges of an otherwise wholesome undertaking—is flatly contradicted by the record.  Accordingly, we reject Campbell's assertion that any fraud he committed was merely a matter of degree.  Because that assertion was a necessary element of his argument that the amount of loss would be impossible to accurately estimate, we reject Campbell's argument that the District Court erred by not using the amount he gained (instead of the amount Alabama lost) to figure the level enhancement under § 2B1.1(b)(1).

That brings us to the legal question.  As an alternative to his argument that the State's losses are impossible to calculate under the "billing fraud" method, Campbell suggests that the Government bore the burden of proving the

26

illegitimacy of each of the Institute's expenditures, item by item.  In other words,

Campbell argues that the District Court should have begun its loss calculation at

zero and worked its way up as the Government proved that various activities

undertaken by the Institute were not valuable to the State.

As already noted, the government must prove the facts underlying a

proposed sentence by a preponderance of the evidence, Rodriguez, 732 F.3d at

1305, and the district court must hold it to that burden and must "support its loss

calculation with reliable and specific evidence," Munoz, 430 F.3d at 1370.  In

cases like Campbell's, that requirement does not demand that the Government and

the court sift through years of bank records and receipts to ascertain itemized proof

of every single transaction that should be chalked up as a loss to the victim.  See

Orton, 73 F.3d at 334–35 (explaining that "an exhaustive inquiry is not required in

every case" involving a complicated fraudulent scheme in which the victims' loss

is difficult to calculate).[13]  Nor does it require the district court to use some other

---

[13] Orton involved a Ponzi scheme, but its basic point holds true for all types of fraud.  As we explained,

> a sentencing court is not generally required to make detailed findings of
> individualized losses to each victim in every case.  There are cases where it would
> be unduly cumbersome, potentially requiring large expenditures of time and
> resources to determine large amounts of detailed information.  Such a rigid rule is
> not required by the Guidelines.  All that is required is that the court "make a
> reasonable estimate of the loss, given the available information."  U.S.S.G.
> § 2F1.1, comment. (n.8) (emphasis added).  Where detailed information is not
> available, a detailed estimate is not required.

Orton, 73 F.3d at 335 (the language quoted from U.S.S.G. § 2F1.1 cmt. n.8 now appears, slightly
altered, in § 2B1.1 cmt. n.C).

variation of Campbell's "bottom-up" approach to calculating loss. Where, as here, a defendant's conduct was permeated with fraud, a district court does not err by treating the amount that was transferred from the victim to the fraudulent enterprise as the starting point for calculating the victim's pecuniary harm. See United States v. Washington, 715 F.3d 975, 985 (6th Cir. 2013) ("[The district court] would have been justified in finding the amount of loss to be the entire $3.32 million [paid to the defendants] because it found that the entire [] program was a sham.").

That is not to say that the total amount of state funding received by the Institute should have been the final number used to fix Campbell's § 2B1.1(b)(1) level increase. As we already observed, "value may be rendered even amid fraudulent conduct," Sayakhom, 186 F.3d at 946, and the Guidelines commentary required the court to grant a credit for any "money returned" or "the fair market value of . . . services rendered" to the State, U.S.S.G. § 2B1.1 cmt. n.3(E)(i). The District Court granted such a credit for the $1.4 million that the Institute transferred to ASBDC members.

Campbell's final argument on appeal is that the District Court should have also granted a credit for the costs associated with running the Institute. Before the District Court, Campbell sought a credit for lobbying expenses, legal fees, accounting fees, taxes, bills, employee salaries, insurance, vehicle leases, and other

28

various expenses that were "legitimate expenses for a nonprofit to incur." Campbell Sent. Mem., Doc. 100, at 16 & n.4.  He has now submitted to this court a list of business expenses totaling nearly $2.7 million that, he claims, should credited against the already-reduced $5.9 million loss amount.  See Reply Br., App. II.  As an initial matter, even if the District Court had granted a credit for all $2.7 million, the total loss amount would still remain above $2.5 million—the lower bound of the 18-level enhancement Campbell received.[14]  See U.S.S.G. § 2B1.1(b)(1)(J).

But Campbell's argument suffers from more than a mathematical flaw; he presupposes that he is entitled to deduct the Institute's operating expenses because they are appropriate expenses incurred in operating a nonprofit.  That is not enough to entitle Campbell to a credit.  As the Seventh Circuit has explained in the face of a similar argument, "[t]he monies . . . spent as part of [a] fraudulent scheme do not become 'legitimate business expenses' simply because other legitimate businesses also incur these expenses."  Marvin, 28 F.3d at 665.  The relevant inquiry is whether any legitimate value was rendered to the State of Alabama.  See U.S.S.G. § 2B1.1 cmt. n.3(C).  The District Court concluded that many of the expenses cited

---

[14] Campbell tries to get below this $2.5 million threshold by including in his list of proposed credits the $1.5 million balance of a certificate of deposit that the Government seized. Though he never says so directly, we presume that he believes this amount should be credited as "money returned" to the victim.  See U.S.S.G. § 2B1.1 cmt. n.3(E)(i).  But the Guidelines commentary is clear that the a credit is only available for money returned or services rendered "before the offense was detected."  Id.

by Campbell—rather than benefiting the State—"played some role in perpetuating the scheme and the crime against the state." Sent. Tr., Doc. 123, at 66. Such expenses are obviously not creditable against Campbell's loss. See Orton, 73 F.3d at 334; Blitz, 151 F.3d at 1012.

Therefore, we find the District Court's method for estimating Campbell's loss to have been appropriate under the circumstances, and the ultimate "answer" the District Court reached to have been a reasonable estimate of the pecuniary harm Campbell's scheme inflicted on the State of Alabama.

IV.

For the foregoing reasons, Campbell's convictions and sentences are AFFIRMED.