[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

Nos. 19-12239, 19-13636
Non-Argument Calendar

————————————————

D.C. Docket No. 5:17-cr-00026-MTT-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAVE CARTY,

Defendant-Appellant.

————————————————

Appeals from the United States District Court
for the Middle District of Georgia

————————————————

(July 20, 2020)

Before MARTIN, ROSENBAUM, and ANDERSON, Circuit Judges.

PER CURIAM:

Dave Carty was indicted on 13 counts of wire fraud, wire fraud conspiracy,

mail fraud, and money laundering conspiracy.  He went to trial, where he was

acquitted by a jury on all charges except one count of wire fraud. The district court sentenced him to 50-months imprisonment. The court also ordered Carty to pay $1.9 million in restitution to the Bibb County School District. On appeal, Carty challenges his conviction, his term of imprisonment, and the order of restitution.

Following careful review, we affirm.

## I.

### A. FACTUAL BACKGROUND

In 2011, the Bibb County School District (the "School District") in Macon, Georgia, decided to overhaul and upgrade its classroom technology. An outside auditor hired by the School District recommended that the district replace all 27,500 school computers, at an estimated cost of $52 million.

In June 2012, the School District solicited bids for a project manager to oversee the necessary hardware and software upgrades. One of the three companies that prequalified for the project was Progressive Consulting Technologies, Inc. ("Progressive"), located in Macon. Carty served as Progressive's Vice-President and Chief Operating Officer, while codefendant Isaac Culver served as the firm's President and Chief Executive Officer. CompTech, Inc., a federal contracting firm located in Dayton, Ohio, supported Progressive's bid for the technology upgrade by submitting a reference letter from Allen Stephen, CompTech's President and Chief Executive Officer. In August 2012,

2

Progressive was awarded the position of project manager for the School District's technology upgrade. From September 2012 through June 2013, the School District paid Progressive $953,360 for services that the firm performed as project manager.

Around this time, Progressive set up a demonstration at a Bibb County high school to display a variety of technology options for the upgrade. One of the devices was the NComputing L300 ("L300" or "NComputing device"). The L300 is what is known as a "thin client," a device that connects multiple monitors to a single personal computer ("PC") acting as a server. With an L300 connected, one PC can serve up to 30 or 40 different monitors. As of 2012, the L300 was considered to be a good computing product for school districts. The School District decided to organize its classroom software upgrade around the L300.

The School District wanted to purchase the equipment on a "GSA schedule," which allows companies to sell products to government entities at a previously negotiated price. CompTech was listed on a GSA schedule, though it had never before made a GSA sale.

In December 2012, Progressive negotiated with NComputing for the purchase of 15,000 L300s. Progressive agreed to pay $159 per device for 11,000 L300s, and NComputing agreed to donate 4,000 additional devices to the School District. The total cost for the 15,000 L300s, including a vSpace server and

3

management center, was $1,749,000 ($116.60 per device).  The sale was a direct sale from the manufacturer, not a GSA sale.

On December 17, 2012, Carty sent an email to Allen Stephen at CompTech.  Even though CompTech had not been involved in the NComputing transaction, Carty instructed Stephen to send the School District an invoice for the NComputing devices and support on CompTech letterhead, using CompTech's GSA information.  Originally, Carty sent Stephen a blank invoice with a total cost of $3,607,500.  The invoice charged the School District for all 15,000 devices, as well as certain support and management services that NComputing had provided at no cost.  Later that day, Carty changed the total amount to $3,768,000.  Either Carty or Culver also requested the invoice number be changed from "GSA0001" to "GSA0037," so as not to look like this was CompTech's first GSA sale.  In the end, the invoice (which we refer to as the "NComputing Invoice") charged the School District $2,235,000 for 15,000 L300s ($149 per device), as well as $1,533,000 in management and installation fees.  This amount was separate from the management fees the School District paid to Progressive.  The next day, Stephen emailed the NComputing Invoice to the School District's Information Technology ("IT") Director.

On December 21, the School District wired $3,768,000 to CompTech for the sale.  On Culver's instructions, CompTech wired $2,151,750 to Progressive's bank

4

account. That same day, Progressive wired $1,749,000 to NComputing for the previously negotiated devices and corresponding support services. A few days later, Culver directed Stephen to send a check for $1,537,990 to Progressive, which he did.

Initially, 300 of the NComputing devices were deployed and installed in pilot projects at three Bibb County schools. In the spring of 2013, an attorney for the School District asked Stephen for updates about installation and deployment of the remaining devices. Although the NComputing Invoice—which was on CompTech letterhead—provided for installation, it was Stephen's understanding that Progressive would do the installation. In April, Culver told Stephen to tell the School District that CompTech would install the devices. He also instructed Stephen to tell the School District that two "employees" named in the email would do the installation. Stephen later testified that CompTech was not in charge of installation and the two employees named in Culver's email were not CompTech employees.

In the fall of 2013, Michael Hall, the School District's new IT Director, shut down the technology upgrade project. Hall concluded that the cost of implementation was too high, and that the NComputing devices were not the right fit for the classrooms. Aside from the 300 devices used in the pilot project, the rest of the order—totaling 14,700 NComputing devices—stayed in storage, where they

5

remained through Carty's trial.  The School District later entered into negotiations

with a company called Firefly to sell 13,500 of the unused devices for $65 each,

but the plan fell through when NComputing refused to provide the necessary

licenses.  At the time the negotiations with Firefly were ongoing, NComputing also

offered to buy the devices back at $40 per unit.

## B. PROCEDURAL HISTORY

Carty, Culver, and Progressive were indicted by a federal grand jury in 2017.

The indictment charged each party with 13 counts of wire fraud, wire fraud

conspiracy, mail fraud, and money laundering conspiracy.  Relevant to this appeal,

Count Two charged wire fraud based on Carty's December 17, 2012 email to

Stephen, to which Carty attached a blank invoice (which became the NComputing

Invoice) and in which Carty requested that Stephen transcribe CompTech's

letterhead onto the invoice.  Carty pled not guilty to all charges.

### 1.  Trial

Prior to trial, Carty moved in limine to exclude evidence of the $953,360 in

management fees the School District paid to Progressive.  We refer to the invoices

and payments reflecting these management fees as the "Progressive Invoices."

Carty maintained that the Progressive Invoices were not relevant to the charged

conduct, and that any relevance would be outweighed by the jury's negative

inference "that [Progressive] was already earning a great deal of money from [the

6

School District] through its project manager contract." The government responded that this evidence was relevant to distinguishing between how Progressive billed when it was acting legitimately, and how it billed when it was trying to make the NComputing Invoice look legitimate. The government submitted that exclusion was not warranted because any negative inference the jury might draw would not outweigh the probative value of the evidence. The government later added that the evidence would show Progressive was already getting paid for the work it was doing for the School District and it did not need to build payment into the cost of the NComputing devices.

The district court preliminarily found that the government "made a sufficient showing to preclude the granting" of Carty's motion in limine. The government then introduced the Progressive Invoices at trial through testimony but did not publish the documents to the jury. Following the close of evidence on the second day of trial, the court again ruled that the Progressive Invoices could come in as evidence. The next day, one of the government's witnesses discussed two of the Progressive Invoices in detail. The fourth day of trial, another witness identified the checks the School District paid to Progressive on the invoices. The checks were summarized on a chart showing total payments to Progressive in the amount of $953,360. Carty's objection to the summary chart's introduction was overruled and the chart was admitted into evidence.

7

During closing arguments on the last day of trial, counsel for the government told the jury that Carty "turned the role of technical project manager for the Bibb County School District into a cash windfall." Carty objected to this statement; the court again overruled the objection. The jury then returned a verdict of guilty on Count Two and not guilty on all other counts.

## 2. Presentence Proceedings

Following Carty's conviction, the Probation Office prepared a presentence investigation report ("PSR") for him. The PSR set Carty's base offense level at 7. Probation increased Carty's offense level by 18 because the intended loss amount of the offense was greater than $3,500,000 but less than $9,500,000. Probation also increased Carty's offense level by 2 because the offense involved sophisticated means. With a total offense level of 27 and no criminal history, Carty's sentence range under the U.S. Sentencing Guidelines was 70–87 months. The Probation Office also recommended restitution in the amount of $1,922,520.02 to the School District. This amount was calculated as follows:

|   | | |
|---|---|---|
| | $3,768,000.00 | (the amount the School District paid pursuant to the NComputing Invoice) |
| - | $34,980.00 | (300 installed NComputing devices multiplied by an actual cost of $116.60) |
| - | $955,500.00 | (14,700 stored NComputing devices multiplied by $65, the price Firefly offered for them) |
| - | $854,999.98 | (the amount the School District received in a civil settlement) |
| | $1,922,520.02 | |

Carty objected to the PSR's loss determination.  He first argued that the School District did not suffer pecuniary harm because the NComputing devices were delivered in working order and thus "the only loss [the School District] suffered was being deceived about the identity of the vendor."  Even if the "loss" were any amount the School District paid in excess of the GSA schedule price—which Carty, through his offense conduct, led the School District to believe it was paying—Carty argued the pricing information in the record compels a finding of no loss or a lower loss than that reflected in the PSR.  The government agreed with Carty that the draft PSR incorrectly calculated the loss amount but rejected the idea that there was no loss.  The government argued the loss amount should be set at $3,393,000.  This was the NComputing Invoice amount, less the amount NComputing later offered the School District to buy back the devices ($25 per device, so $375,000 total).  In the alternative, the government argued Carty inflated the price of the NComputing devices by $2,019,000.  This was the amount in the NComputing Invoice, less what Progressive actually paid for the devices.  Either way, the government noted, a 16-level increase for a loss amount falling between $1,500,000 and $3,500,000 would be proper.  The PSR was edited to include an actual loss of $1,922,520.02 (the same as the preliminary restitution amount), resulting in a 16-level increase.

9

Carty objected, as well, to the imposition of restitution. He said the School District was not a victim because it chose to keep the NComputing devices in storage, rather than use or sell them. In the alternative, he argued that the evidence at trial—rather than the price offered by Firefly or NComputing—should be the basis for determining the value of the devices in the School District's possession. The Probation Office stood by its restitution recommendation from the original PSR.

3. Sentencing

At the sentence hearing, Carty renewed his objection to the loss amount determination. The court, after hearing from the government and discussing various aspects of the loss calculation, overruled Carty's objection. The court stated it was "satisfied that the loss amount exceeds $1.5 million." The court then sentenced Carty to 50-months imprisonment, followed by 3 years of supervised release. Carty timely appealed from his judgment of conviction.

At sentencing, the court told the parties it would address restitution and forfeiture by separate order. After giving the parties a chance to submit supplemental briefing, the court ordered Carty to pay $1,920,853.36 in restitution, jointly and severally with his codefendants, to the School District. The court found that restitution was mandatory because Carty caused the School District to suffer a pecuniary loss. The court adopted the Probation Office's restitution calculation,

10

except that it offset the judgment by $856,666.64 to reflect the updated amount of money the School District received pursuant to the civil settlement. The court also ordered $148,000 in forfeiture, to which Carty did not object. The court entered an amended judgment, from which Carty also appealed.

## II.

Carty makes three arguments in his consolidated appeal. First, he argues his conviction should be vacated based on the admission of the Progressive Invoices. Second, he argues his sentence should be vacated because the district court failed to make independent or specific findings regarding the loss amount. Finally, he argues the district court considered the wrong factors when calculating the restitution award.

We first conclude that the district court did not err in admitting the Progressive Invoices into evidence. We then turn to the restitution calculation, which Carty cannot show was done with clear error. Finally, any error in calculating the loss amount for sentencing was harmless. As a result, we affirm.

## A.

"Determinations of admissibility of evidence rest largely within the discretion of the trial judge and will not be disturbed on appeal absent a clear showing of an abuse of discretion." United States v. Baptiste, 935 F.3d 1304, 1311 (11th Cir. 2019) (quotation marks omitted). Federal Rule of Evidence 403

11

provides that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger" of unfair prejudice.  Even where a party shows the district court abused its discretion in determining the admissibility of evidence, "nonconstitutional evidentiary errors are not grounds for reversal absent a reasonable likelihood that the defendant's substantial rights were affected." United States v. Gibson, 708 F.3d 1256, 1275 (11th Cir. 2013) (quotation marks omitted).  "In reviewing issues under Federal Rule of Evidence 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact."  Id. (alteration adopted) (quotation marks omitted).

The district court did not abuse its discretion when it permitted the introduction of the Progressive Invoices.  The district court properly found that these invoices were relevant to explain Progressive's role as project manager and to prevent the jury from inferring that the upcharge in the NComputing Invoice was necessary to compensate Progressive for other services rendered.  The Progressive Invoices were also relevant to show that Progressive normally charged the School District for work only after it had been completed, whereas the NComputing Invoice was submitted before the services were rendered.  Because the Progressive Invoices had a tendency to make Carty's guilt on Count Two more probable, they were relevant evidence.  See Fed. R. Evid. 401.  In addition, viewed

12

in the light most favorable to admission, the Progressive Invoices did not unfairly prejudice the jury. The trial record shows the invoices were used for the limited purpose described above—not for inflaming the jury against Carty. Carty challenges the government's statement in closing that he "turned the role of technical project manager for the Bibb County School District into a cash windfall." The context of this statement shows the government was referring to the $2 million profit Progressive made by obscuring its role as vendor of the NComputing devices, not the smaller, legitimate payments it received as the project manager.

We have no trouble concluding that the probative value of the Progressive Invoices was not "substantially outweighed" by any danger of prejudice. See Fed. R. Evid. 403. As a result, this evidence was properly admitted by the district court.

B.

Under the Mandatory Victims Restitution Act ("MVRA"), a district court must "grant restitution to all victims once a defendant is convicted of 'any offense . . . in which an identifiable victim or victims has suffered a . . . pecuniary loss.'" United States v. Goldman, 953 F.3d 1213, 1223 (11th Cir. 2020) (alterations in original) (quoting 18 U.S.C. § 3663A(c)(1)(B)). In order to qualify as a victim under the MVRA, an entity "must have suffered a harm that directly and proximately results from the commission of [the defendant's] offenses." United

States v. Robertson, 493 F.3d 1322, 1334 (11th Cir. 2007) (alteration adopted) (quotation marks omitted). "The government must show [by a preponderance of the evidence] not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal connection between the conduct and the loss is not too attenuated (either factually or temporally)." Id. (alteration adopted) (quotation marks omitted); see United States v. Martin, 803 F.3d 581, 593 (11th Cir. 2015). The government also bears the burden of proving by a preponderance of the evidence the existence and amount of loss. See United States v. Sheffield, 939 F.3d 1274, 1276 (11th Cir. 2019). "As part of its burden to prove a restitution amount, the government must deduct any value that a defendant's fraudulent scheme imparted to the victims." United States v. Huff, 609 F.3d 1240, 1247 (11th Cir. 2010) (alteration adopted) (quotation marks omitted). "We review de novo questions of law concerning a restitution order, and we review for clear error the factual findings supporting a restitution order." Goldman, 953 F.3d at 1223.

Carty first asserts that restitution is inappropriate because the School District did not suffer a pecuniary loss. He is mistaken. But for Carty's misrepresentations in the NComputing Invoice, the School District would not have paid the inflated price of $3,768,000 for the NComputing devices. This qualifies the School District as a victim under the MVRA. Robertson, 493 F.3d at 1334.

14

Carty also says the district court erred by holding him jointly and severally liable for the restitution amount with his codefendants. As evidenced by the jury verdict on Count Two, Carty was culpable for the large loss suffered by the School District. In this circumstance, the district court may apportion restitution jointly and severally. See United States v. Puentes, 803 F.3d 597, 605 (11th Cir. 2015) (explaining, that, in cases involving multiple defendants, a district court "may make each defendant liable for the full amount of restitution, or may apportion liability among the defendants based on their level of contribution to the victims' losses"). The court did not err in doing so here.

Carty finally argues the district court erred in calculating the amount of restitution. However, Carty has failed to show the district court committed clear error in this regard. First, the court used the correct starting point for its calculation: the $3,768,000 the School District paid pursuant to the NComputing Invoice. The district court then correctly reduced this amount by $34,980, valuing each of the 300 devices used in the pilot program at the $116.60 per device charged by NComputing. Carty says the court should have used the 2019 GSA schedule prices established at trial. However, it was reasonable for the court to decline to use the 2019 GSA schedule values. As the court pointed out in its restitution order, the 2019 GSA schedule single-device prices do not reflect the value the School District received from negotiating and executing a large-volume

15

purchase.  The court did not err in using the $116.60 per-device price to calculate the value the School District received for the pilot-project devices.  The court also properly reduced the restitution amount by the $856,666.64 the School District received in the civil settlement.

Finally, the district court did not clearly err in its valuation of the remaining 14,700 NComputing devices.  Unlike the 300 devices used in the pilot project, the remaining devices were never installed.  The district court found that the School District purchased the NComputing devices assuming "installation, licensing, [and] accessories" would be included.  The court then found that, only after purchasing the devices and running the 300-device pilot program did the School District realize that "more substantial and prohibitive investment was required in order to use the remaining 14,700 uninstalled terminals."  Because, in the court's opinion, it would not be fair to use the $116.60 figure to value devices that the School District was cost prohibited from installing, the court valued the remaining devices at $65 each, based on the price Firefly offered the School District for them.

In order to vacate this calculation on appeal, Carty must show the district court clearly erred in finding the School District could not realize the full value of the NComputing devices and faulting Carty for this outcome.  He cannot do so.  Carty's few record citations do not persuade us it was clear error for the district court to find the School District "could not afford" to install the remaining devices.

16

Nor has Carty shown that the district court clearly erred in holding him responsible for the unused devices.  As the government points out, if Carty had "not undertaken to disguise the source of the purchase of the NComputing devices, the School [District] would never have been in the possession of goods that were not suitable for its limited resources."  Br. of Appellee at 55.  Carty does not—and cannot—contest this obviously correct assertion.  The district court's choice to value the 14,700 remaining devices at $65 each was thus reasonable.

## C.

According to the sentencing guidelines, the base offense level for a defendant convicted of fraud must be increased based on the amount of "loss" caused by the defendant.  See USSG § 2B1.1(b)(1).  The loss amount "is the greater of actual loss or intended loss."  Id. § 2B1.1 cmt. n.3(A).  Although the district court need not make "a precise determination of loss," United States v. Moran, 778 F.3d 942, 973 (11th Cir. 2015), the discretion of the court is "not altogether unfettered in calculating the loss amount," United States v. Campbell, 765 F.3d 1291, 1301 (11th Cir. 2014).  Importantly, "the court must support its loss calculation with reliable and specific evidence."  Id. (quotation marks omitted).  The district court must also "make independent findings establishing the factual basis for its Guidelines calculations," including loss amount.  United States v. Hamaker, 455 F.3d 1316, 1338 (11th Cir. 2006).  "Because district courts are in a

17

unique position to evaluate the evidence relevant to a loss determination," we review this determination for clear error. United States v. Elbeblawy, 899 F.3d 925, 933, 940 (11th Cir. 2018) (alteration adopted) (quotation marks omitted). Under this standard, we will only upset a loss determination if "we are left with a definite and firm conviction that a mistake has been committed." Campbell, 765 F.3d at 1302 (quotation marks omitted). Objections or arguments not raised before the district court are reviewed for plain error. See United States v. Evans, 478 F.3d 1332, 1338 (11th Cir. 2007).

Carty first argues that the district court failed to make an independent finding of the loss amount. This challenge was not raised before the district court, so we review it for plain error. See id. Carty focuses on the district court's statement at sentencing: "I'm satisfied that the loss amount exceeds $1.5 million." We disagree with Carty that this sentence shows that the district court failed to make an independent finding. Just minutes before, the court went through several aspects of the loss calculation and asked Carty's attorney why the loss was not Progressive's $2 million upcharge for the devices. This shows the court did not commit plain error by failing to make independent findings of loss.

Carty also argues the district court did not have an evidentiary basis for the loss enhancement. We reject this challenge. While the district court did not precisely specify which calculation it was using to determine loss, this was not

18

error because the loss determination need not be "precise." Moran, 778 F.3d at 973. No matter what, the correct loss amount falls within the range for a 16-level loss enhancement. See USSG § 2B1.1(b)(1)(I); see also Br. of Appellee at 45–46 (setting forth alternative loss calculations, all of which are greater than $1.5 million but less than $3.5 million). As a result, any error was harmless. See United States v. Woodard, 459 F.3d 1078, 1087 (11th Cir. 2006) (per curiam). Carty renews his argument that the 2019 GSA schedule prices mean the School District suffered a smaller loss than what the government and district court submit. We reject Carty's alternative loss calculations for the same reasons as our earlier holding that the district court did not clearly err in valuing the NComputing devices in the context of restitution.

**AFFIRMED.**