[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-13132
_____

D.C. Docket No. 2:11-cr-14052-KMM-1

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

versus

JEFFREY WAYNE AUNSPAUGH,
ANGELA BRYANT AUNSPAUGH,

Defendants – Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(July 8, 2015)

Before MARTIN, Circuit Judge, and RESTANI,* Judge, and HINKLE,** District
Judge.

HINKLE, District Judge:

_____

 * Honorable Jane A. Restani, Judge for the United States Court of International Trade,
sitting by designation.
 ** Honorable Robert L. Hinkle, United States District Judge for the Northern District of
Florida, sitting by designation

This is an honest-services fraud case. On one view of the evidence, the defendants participated in a classic kickback scheme. On another view, the scheme involved an egregious conflict of interest but no kickback. Under Skilling v. United States, 561 U.S. 358 (2010), the defendants' conduct constituted honest-services fraud only on the first view, not the second. Because the jury instructions would have allowed a conviction on either view of the evidence, we vacate the honest-services convictions. We also vacate other convictions that depend on the honest-services convictions. But we uphold convictions for structuring financial transactions not dependent on the honest-services convictions.

I

A grand jury returned a four-count superseding indictment against the appellants Jeffrey Wayne Aunspaugh and Angela Bryant Aunspaugh, who are husband and wife, together with Christopher Andrew Hale. Count one charged conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349. Count two charged conspiracy to commit money laundering—to launder the proceeds of the mail fraud—in violation of 18 U.S.C. § 1956(h). Count three charged conspiracy to structure financial transactions in violation of the general conspiracy statute, 18 U.S.C. § 371. Count four charged actually structuring transactions in violation of 31 U.S.C. § 5324. Count four also charged that the defendants were subject to the

2

enhanced penalty for structuring while violating another federal law.  See 31 U.S.C. § 5324(d)(2).

Mr. Hale pleaded guilty.  The Aunspaughs went to trial.  The district court denied their motions for judgment of acquittal as asserted both at the close of the government's case and at the close of all the evidence.  The court modified the circuit's standard honest-services instruction in light of Skilling, but the Aunspaughs objected, asserting that the instruction as modified still did not comport with Skilling.  The court overruled the objection.

The jury convicted the Aunspaughs on all counts and, in response to a special interrogatory, found that the structuring in count four was committed while the Aunspaughs were violating another federal law—that is, while they were committing the honest-services offense.  That finding increased the maximum permissible sentence for structuring.  The court sentenced each of the Aunspaughs to 63 months in prison, the high end of the guideline range, on each count concurrently, and ordered them to pay restitution.  They appeal, asserting that the evidence was insufficient to sustain the convictions, that the honest-services jury instruction was improper, and that the court miscalculated both the amount of loss (used in calculating the guideline range) and restitution.  Mr. Hale has separately appealed, challenging only the restitution portion of his sentence.  We address his appeal in a separate opinion.

3

II

During the period at issue, Glades Electric Cooperative ("GEC") provided electrical power in four rural counties in central Florida. GEC had a wholly owned subsidiary, Glades Utility Services, Inc. ("GUS"), that performed repair and maintenance services for GEC and unrelated entities. GUS performed work using its own equipment and employees but also sometimes hired subcontractors. And GUS allowed its employees to moonlight—to work on projects on their own or as employees of others while not on company time—so long as the work was disclosed to GUS.

Mr. Hale became GUS's general manager in 2005. Before the year was out, he began directing subcontracts to Ener-Phase Electric, Inc., a corporation owned by the Aunspaughs. Mr. Hale was married to Ms. Aunspaugh's sister.

Ener-Phase did not perform the work under the subcontracts but instead hired a GUS employee, Steve Rolen, to do the work. Ener-Phase made secret payments to Mr. Hale for his role in this arrangement. The Aunspaughs say the payments were for the work Mr. Hale did—providing information to Ms. Aunspaugh for her use in preparing invoices to GUS. The government asserts the payments were kickbacks—illegal compensation for steering the work to Ener-Phase. Neither Mr. Hale nor Mr. Rolen disclosed their work for Ener-Phase to anyone else at GUS.

4

The relationship between GUS and Ener-Phase greatly expanded in the aftermath of Hurricane Wilma. The hurricane crossed GEC's coverage area in October 2005, shifting thousands of wooden utility poles. The Federal Emergency Management Agency approved GEC's application for funds to straighten the poles. GEC assigned the work to GUS, which initially subcontracted with a local engineering firm, Transpower, Inc. Mr. Hale soon replaced that firm with Ener-Phase. Ener-Phase had a license and insurance coverage but otherwise lacked the resources to perform work of this kind. Ener-Phase again hired Mr. Rolen, who did the work using GUS's equipment.

For each of some 4,000 poles he straightened, Mr. Rolen charged Ener-Phase $75. Ener-Phase charged GUS $225. Ener-Phase generally paid Mr. Hale half of its $150 margin per pole. Ener-Phase and Mr. Hale each netted hundreds of thousands of dollars from this arrangement. The Aunspaughs say the payments to Mr. Hale were compensation for work he did overseeing Mr. Rolen and preparing invoices. Mr. Hale testified to the contrary; he said he did not monitor the work or provide any other essential function. The government again says the payments were kickbacks.

## III

Federal law has long made it a crime to participate in a scheme to defraud using the mail, 18 U.S.C. § 1341, or a wire, id. § 1343, or to conspire to commit

5

mail or wire fraud, id. § 1349.  Over a period of decades, the courts of appeals interpreted these statutes to include not just schemes to defraud a victim out of money or property but also schemes to defraud an employer of its right to an employee's honest services.  See Skilling, 561 U.S. at 400-01 (tracing this history). But in McNally v. United States, 483 U.S. 350, 360 (1987), the Supreme Court held that the mail-fraud statute was "limited in scope to the protection of property rights."  The Court added, "If Congress desires to go further, it must speak more clearly than it has."  Id.

Congress responded by enacting 18 U.S.C. § 1346: "For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."

Congress did not define "the intangible right of honest services."  In Skilling, the Court rejected the assertion that § 1346 is impermissibly vague, invoking the Court's preference "to construe, not condemn."  561 U.S. at 403.  The Court construed the statute to cover only the "solid core" of the honest-services doctrine as it existed prior to McNally.  Id. at 407.  The Court variously described that core as consisting of cases involving "fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived," id. at 404, or cases involving "offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes."  Id. at 407.  The

6

Court rejected the government's attempt to extend the statute beyond bribery and kickback schemes. We followed Skilling in United States v. Siegelman, 640 F.3d 1159 (11th Cir. 2011).

The evidence against the Aunspaughs was easily sufficient to support their convictions under this construction of the right to honest services. In reviewing the Aunspaughs' contrary contention, the evidence of course must be construed in the light most favorable to the government. See, e.g., United States v. Frank, 599 F.3d 1221, 1233 (11th Cir. 2010). The evidence established beyond any doubt that Mr. Hale steered work to Ener-Phase and that Ener-Phase paid Mr. Hale more than $200,000 without the approval of anyone else at GUS or GEC. Ener-Phase had virtually no ability to do the work and brought almost nothing to the table; any assertion that GUS would legitimately have subcontracted this work to Ener-Phase is weak at best. So a company that had little prospect of getting this work on the merits nonetheless got the work, making a substantial profit for itself while doing little or nothing, and paid more than $200,000 to the employee who sent it the work. When the evidence is viewed in the light most favorable to the government, this was a classic kickback scheme—precisely the kind of scheme that is prohibited under Skilling's construction of § 1346.

To be sure, Ener-Phase had a license and insurance, and it charged less per pole than Transpower, the local contractor Ener-Phase replaced. The Aunspaughs

7

suggest this was a legitimate reason to hire Ener-Phase.  But the argument misses an essential point.  GUS itself had a license and insurance.  So if Mr. Rolen was available to do the work—as he plainly was—then GUS could have paid him directly to do the work.  There was no need for Ener-Phase.  Or so a reasonable jury could conclude.

Hiring Mr. Rolen directly would have greatly reduced the cost to GUS.  The Aunspaughs say this would have made no legitimate difference to GEC or GUS, because they were entitled to recover from FEMA only the actual cost of straightening the poles—no more and no less.  On that view, any inflated cost of hiring Ener-Phase would have been borne by FEMA, not by GEC or GUS.  But there is an obvious flaw in the theory—FEMA's actual payment to GEC was not tied to the amount GUS paid Ener-Phase or could have paid Mr. Rolen.  And this makes no difference anyway; it is unlawful to pay a kickback to an employee, even if the tainted transaction did not harm—or even benefitted—the employer.  Put differently, it is no more legal for an employee to accept a kickback in connection with a winning transaction than in a losing one.  See United States v. Rybicki, 354 F.3d 124, 145 (2d Cir. 2003) ("[A]ctual or intended economic or pecuniary harm to the victim need not be established.").

More importantly, even if Ener-Phase somehow played a legitimate role in the pole-straightening project, and even if hiring Ener-Phase was a good business

8

arrangement for GUS—propositions that a reasonable jury would be hard pressed to accept—the essential point is that Ener-Phase made undisclosed payments to Mr. Hale. A reasonable jury could conclude that the payments were intended to induce Mr. Hale to steer the contract to Ener-Phase (if indeed a quid pro quo is required) or to reward him for doing so (if that is sufficient).

We have not decided whether a quid pro quo is required or a reward is sufficient, and we need not do so here. See United States v. Nelson, 712 F.3d 498, 509 (11th Cir. 2013). On either view of the law, a reasonable jury could conclude the payments to Mr. Hale were unlawful kickbacks. See Skilling, 561 U.S. at 412-13 (stating that for this purpose, the definition of a "kickback" draws content from pre-McNally caselaw and from statutes including 41 U.S.C. § 52(2): "The term 'kickback' means any money . . . or compensation of any kind which is provided, directly or indirectly, to [a contractor or contractor's employee] for the purpose of improperly obtaining or rewarding favorable treatment in connection with [the contract].") (ellipses added and bracketed language revised).

GUS was entitled to have Mr. Hale evaluate the issue of subcontracting without being secretly paid by an entity seeking the subcontract and without being secretly rewarded for his decision. GUS was entitled to Mr. Hale's honest services.

9

The Aunspaughs are not entitled to a judgment of acquittal on the honest-services charge.

## IV

The Aunspaughs were, however, entitled to have the jury apply the law as set out in Skilling.  They were entitled, that is, to be convicted only if the jury found, based on proper instructions, that the payments to Mr. Hale were kickbacks.

As set out above, the evidence was easily sufficient to allow a reasonable jury to conclude the payments were indeed kickbacks.  But the Aunspaughs had a contrary theory.  They asserted the payments were legitimate payments to Mr. Hale for his role in overseeing Mr. Rolen's work and for preparing invoices.  This was a lot of money for so little work, but Ener-Phase also received a lot of money for little work; Mr. Hale may have done as much for his share of the proceeds as Ener-Phase did for its share.  One suspects this was not the first enormously favorable contract for work funded by a federal agency and that such contracts sometimes have been awarded even in the absence of a kickback.

In two respects, Mr. Hale acted improperly even if the funds he received were compensation for his work on the project, not kickbacks.  First, Mr. Hale did not disclose his work to GUS.  GUS policy allowed employees to do work for themselves rather than for GUS—to moonlight—but only when they disclosed the work to GUS.  And second, Mr. Hale steered work to a company owned by a

relative—Ms. Aunspaugh was Mr. Hale's sister-in-law—without disclosing the relationship to GUS.

Before McNally, some courts held that self-dealing and conflicts of interest could constitute honest-services fraud.  In Skilling, the government asserted that self-dealing was still honest-services fraud.  But the Court disagreed.  After holding that § 1346 applies to bribes and kickbacks, the Court continued: "The Government urges us to go further by locating within § 1346's compass another category of proscribed conduct: 'undisclosed self-dealing by a public official or private employee—i.e., the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty.' "  Skilling, 561 U.S. at 409.  The Court squarely rejected the government's entreaty, holding that § 1346 does not apply to such conduct in the absence of a bribe or kickback.  Because no bribe or kickback was paid in that case, the Court reversed the conviction.

The upshot is clear.  The Aunspaughs could be convicted of honest-services fraud if the jury found that the payments to Mr. Hale were kickbacks, but not on a finding that the payments were only self-dealing or an improper steering of a contract to a relative.  The Aunspaughs were entitled to jury instructions fairly presenting this issue.  See, e.g., United States v. Ruiz, 59 F.3d 1151, 1154 (11th Cir. 1995) (holding that a defendant is entitled to instructions that allow

11

presentation of any legitimate defense supported by the evidence, even if the evidence supporting the defense is weak).

The instructions fell short because they would have allowed the jury to convict the Aunspaughs even if the jury found that the payments to Mr. Hale were compensation for his work on the pole-straightening project—that is, if the jury found Mr. Hale was guilty of self-dealing but did not receive a kickback.

The most critical instruction—the instruction listing the elements of the offense—was this:

> For you to find the defendant guilty of this offense, the government must prove beyond a reasonable doubt:
>
> First:  that two or more persons agreed to accomplish a common and unlawful plan as charged in the Indictment, that is, to devise or participate in a scheme to defraud Glades Utilities Services, Inc. of its right to the honest services of Christopher Hale <u>through the payment of a kickback</u>;
>
> Second:  the Defendant knew the unlawful purpose of the plan and willfully joined it with an intent to defraud;
>
> Third:  the scheme or artifice to defraud involved a material misrepresentation, false statement, false pretense, or concealment of fact; and
>
> Fourth:  in advancing, or furthering, or carrying out the scheme to defraud, the defendant used the United States Postal Service by mailing or causing to be mailed some matter or thing to carry out the scheme to defraud.

(Emphasis added.)

12

So far, so good: the instruction plainly told the jury that it could convict the Aunspaughs on this charge only if the jury found beyond a reasonable doubt that they willfully joined in a plan to pay Mr. Hale a kickback.

The problem arose with the later instruction that defined "kickback":

> A "kickback" includes <u>any kind of secret payment</u> or reward a person gives to an employee who has been dealing in the course of employment with that person <u>so that the employee's personal financial interest interferes with the employee's obligation to get the best deal for the employer</u>.

(Emphasis added). By its plain terms, this definition extends not just to a kickback as defined in <u>Skilling</u> but also to self-dealing—precisely the kind of self-dealing that <u>Skilling</u> said was not enough.

An employee who steers work to himself usually acts for his own self-interest. That self-interest often interferes with the employee's obligation to get the best deal for the employer. That is the very definition of self-dealing. But under the court's instruction, this kind of self-dealing comes within the definition of a "kickback." Under the court's instruction, the payments to Mr. Hale were a "kickback" even if the payments were compensation for services actually rendered on the project, rather than payments to induce Mr. Hale to steer the work to Ener-Phase or reward him for doing so. In short, under this instruction, the jury could have convicted the Aunspaughs even if the jury agreed with the Aunspaughs'

13

legitimate theory of defense—the theory that Mr. Hale was paid for the work he did, not for steering the contract to Ener-Phase or as a reward for doing so.

Another instruction compounded the error.  It provided:

> Under the law an employee representing or working for somebody else, that is, the employer, has a duty, called a fiduciary duty, to act honestly and faithfully in all his dealings with the employer and to transact business in the best interest of the employer, including a duty to make full and fair disclosure to the employer of any profit or kickback the employee expects to derive or has derived from working on any of the employer's business transactions.

This instruction missed the mark in at least two respects.

First, the instruction defined a duty much broader than that encompassed within the Skilling definition of honest services.  An employee does indeed have a duty "to act honestly and faithfully in all his dealings with the employer and to transact business in the best interest of the employer," just as the instruction said.  But honest-services fraud does not extend to all or even most violations of that duty.  That was the square holding of Skilling.  There was no need to instruct the jury on a duty whose violation did not constitute honest-services fraud.

Second, the instruction said an employee has "a duty to make full and fair disclosure to the employer of any profit or kickback the employee expects to derive or has derived from working on any of the employer's business transactions." (Emphasis added.)  There was no need to include the language "profit or."  Again, an employee has a duty to disclose any profit inuring to the employee personally—

14

to disclose any self-dealing—but honest-services fraud does not extend to an earned but undisclosed profit.  The instruction compounded the risk that the jury would convict even if it found that this scheme involved only self-dealing, not a kickback of the kind proscribed under Skilling.

The bottom line is this.  The evidence well supported the assertion that the payments to Mr. Hale were kickbacks.  But the Aunspaughs' theory of defense was that the payments were compensation for services rendered.  On that view, the payments were not kickbacks.  The evidence supporting the Aunspaughs' theory was weak but strong enough to require the theory to be covered by the jury instructions.  The instructions fell short because they did not require the jury to acquit on a finding that this scheme involved only self-dealing, not kickbacks.  Quite the contrary, under the instructions, the jury could have convicted the Aunspaughs even if the jury found that Mr. Hale was paid for his work on the project—that this scheme involved only self-dealing, not kickbacks.  This requires reversal of the Aunspaughs' honest-services convictions.

V

A person commits the offense of money laundering when the person conducts a financial transaction with the proceeds of unlawful activity and meets other requirements.  In count two, the superseding indictment charged the

15

Aunspaughs with conspiracy to engage in money laundering.  The alleged unlawful activity was the same honest-services fraud charged in count one.

The assertion that the payments to Mr. Hale constituted money laundering rises or falls with the assertion that the payments were proceeds of honest-services fraud.  As set out above, the evidence was easily sufficient to go to the jury on this question.  But because the honest-services instructions were erroneous, the money-laundering convictions, like the honest-services convictions, must be vacated.

VI

Federal law requires a bank to file a cash transaction report for a deposit or withdrawal of cash in an amount greater than $10,000.  See 31 U.S.C. § 5313; 31 C.F.R. § 1010.311.  A bank customer commits a crime by structuring transactions for the purpose of evading the reporting requirement.  See 31 U.S.C. § 5324(a)(3).  Count three of the superseding indictment charged the defendants with conspiring to commit this crime, thus violating the general conspiracy statute, 18 U.S.C. § 371.  Count four charged a substantive offense—15 specific transactions that constituted structuring.

The evidence established beyond any doubt that Ms. Aunspaugh cashed a series of Ener-Phase checks for amounts just below the reporting requirement.  Proceeds were delivered to Mr. Hale.  The evidence of this was overwhelming, indeed virtually undisputed.  As set out more fully above, on the government's

16

view, the payments were kickbacks.  On the Aunspaughs' view, the payments were compensation for services rendered.  Either way, the checks were cashed.  A cash transaction report would have been required for any check cashed for more than $10,000.  By structuring the transactions as they did, the Aunspaughs avoided the filing of cash transaction reports.

Ms. Aunspaugh was a former bank teller.  A reasonable jury could conclude that she knew the reporting requirement.  A reasonable jury could conclude further that the Aunspaughs wished to avoid the reporting requirement and structured the transactions as they did for that very purpose.  Indeed, Ms. Aunspaugh later told a bank employee she would probably go to jail because of these transactions.

The Aunspaughs say, though, that Ener-Phase drew other checks for more than $10,000 and that this shows they did not engage in structuring.  First, they say that a person does not engage in structuring unless "each" transaction the person participates in is for $10,000 or less.  That is just not so.  To constitute structuring, a transaction of more than $10,000 must be broken into smaller increments, each of which typically is for less than $10,000, thus avoiding the reporting requirement.  This is what makes it structuring.  But a person who once engages in a transaction for more than $10,000 does not get a pass to structure later transactions with impunity.  Thus, for example, a person who makes several withdrawals for more than $10,000 cannot lawfully change course and begin structuring further

17

transactions in increments below $10,000 to avoid the reporting requirement. The Aunspaughs' contrary contention draws no support from the statute and makes no sense.

Second, Ms. Aunspaugh did negotiate other checks for more than $10,000, as the Aunspaughs emphasize. But these were not the subject of the structuring charges. Moreover, Ms. Aunspaugh did not cash these checks. Instead, she made "split" or "less cash" deposits, taking less than $10,000 in cash and thus avoiding the reporting requirement. She deposited the remaining proceeds into bank accounts. A reasonable jury could conclude that this showed an intent to avoid the reporting requirement, fully consistent with the charge that the Aunspaughs engaged in structuring when they began having checks issued for $10,000 or less.

In sum, the evidence was easily sufficient to sustain the structuring convictions. And this is so regardless of whether the funds were kickbacks or merely the proceeds of self-dealing. As is undisputed, Mr. Hale did not tell GUS of his relationship with Ener-Phase. Mr. Hale and the Aunspaughs had a powerful incentive to avoid disclosure of their relationship. If nothing else, disclosure might have led to an investigation—that is, after all, one reason for the reporting requirement—and an investigation was likely to bring a highly profitable venture to an end, even if it did not result in criminal charges. More importantly, the jury was entitled to conclude the payments were not for services rendered but were

18

instead unlawful compensation for steering the contract to Ener-Phase. The jury instructions improperly defining a kickback affect this analysis not at all.

The Aunspaughs contend, though, that structuring can occur only while violating another law and that the court should have so instructed the jury. The assertion is plainly incorrect. The statute defining the offense, 31 U.S.C. § 5324(a)(3), imposes no such requirement, nor does any judicial decision the Aunspaughs have cited or we have found. Quite the contrary, courts have addressed the elements of structuring without referring at all to any requirement to show violation of another law. See, e.g., Ratzlaf v. United States, 510 U.S. 135, 136 (1994); United States v. Lang, 732 F.3d 1246, 1247-48 (11th Cir. 2013).

To be sure, a defendant faces a higher maximum penalty for structuring while violating another federal law (10 years) than for structuring without violating another federal law (5 years). See 31 U.S.C. § 5324(d)(2). Count four charged structuring and alleged that the Aunspaughs were subject to the enhanced maximum penalty. For that to be so, the government was obligated to prove to the jury the factual basis for the enhanced penalty—that the Aunspaughs engaged in structuring while violating another federal law. See Apprendi v. New Jersey, 530 U.S. 466, 497 (2000) (holding that a defendant has a right to a jury trial on any fact, other than a prior conviction, that increases the maximum penalty for an offense). The jury answered a special interrogatory finding that the Aunspaughs

19

committed the structuring offenses while engaged in honest-services fraud, but because of the improper jury instructions on honest-services fraud, this finding, like the honest-services verdict, must be vacated. On remand, the Aunspaughs will face a sentence on count four only up to 5 years, unless the government proves in a new trial that they committed the structuring offense while committing the honest-services offense.

This does not, however, affect count three. That count charged the Aunspaughs with violating the general conspiracy statute, 18 U.S.C. § 371, by conspiring to engage in structuring. On that charge, the maximum penalty was 5 years, and violating another federal law had nothing to do with it. So the erroneous honest-services instruction affected the verdict on count three not at all. The conviction on that count remains valid.

Nonetheless, we vacate the <u>sentence</u> on count three. The court imposed that sentence concurrently with the sentence on the other counts. Without the convictions we have vacated, the sentence may not have been the same. Moreover, the 63-month sentence on count three exceeded the statutory maximum for that count (though at the time of sentencing that made no practical difference and neither side raised the issue on this appeal).[1]

---

[1] We add one other note about sentencing. The Aunspaughs argue that the district court improperly inferred a lack of remorse because they chose not to plead guilty but remained silent instead. They argue that the court's consideration of these things violated their constitutional

## VII

We need not address the Aunspaughs' challenge to the loss determination and restitution amount because those relate only to the honest-services and money-laundering convictions that we vacate. Any necessary guidance on remand can be taken from our separate opinion in Mr. Hale's case, in which we affirm the court's restitution decision.

## VIII

For these reasons, we vacate the guilty verdicts on counts one and two and vacate the special-interrogatory verdicts on count four. We vacate the sentences in their entirety. We remand for further proceedings consistent with this opinion.

---

rights. See, e.g., United States v. Rodriguez, 959 F.2d 193, 197 (11th Cir. 1992) (noting that a district court may weigh remorse in a defendant's favor but must not "weigh against the defendant the defendant's exercise of constitutional or statutory rights"). Because we remand for resentencing, we do not address this issue today. The district court should resentence the defendants without weighing against them their exercise of constitutional rights.

21