**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 24-10672

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

MICHAEL COURTNEY SHIRLEY,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:22-cr-00123-GAP-DCI-1

_____

_____

No. 24-10937

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

MICHAEL COURTNEY SHIRLEY,

*Defendant-Appellant.*

———————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:22-cr-00123-GAP-DCI-1

———————————————

Before NEWSOM and BRASHER, Circuit Judges, and HUCK,* District Judge.

PER CURIAM:

Michael Shirley raises several challenges to his conviction and 87-month sentence for conspiracy to commit honest services wire fraud and for honest services wire fraud. First, Shirley questions the sufficiency of the evidence against him. Second, he raises numerous challenges to the district court's jury instructions, including (1) that the jury instruction's definition of "public official" violated Supreme Court precedent and constructively amended the indictment, (2) that the district court erred by failing to instruct the jury on the lesser offense of paying an unlawful gratuity, and (3) by denying a jury instruction allowing an adverse inference against Shirley's co-conspirator, Joseph Ellicott, for invoking his Fifth Amendment privilege against self-incrimination during his testimony. Third, Shirley raises two evidentiary challenges, arguing

———————————

* Honorable Paul C. Huck, United States District Judge for the Southern District of Florida, sitting by designation.

(1) that the admission of the out-of-court statements of Shirley's other co-conspirator, Joel Greenberg, violated the rule against hearsay and the Sixth Amendment's Confrontation Clause, and (2) that the district court's failure to strike Ellicott's testimony after Ellicott invoked his privilege against self-incrimination violated the Confrontation Clause. Fourth, Shirley argues that the district court erred in overruling Shirley's objections to his base offense level and loss amount at sentencing. Finally, Shirley argues that his trial counsel was ineffective for failing to object to certain leading questions and for failing to argue for a jury instruction on the lesser offense of paying an unlawful gratuity. We disagree with Shirley on the first four issues and decline to consider the last issue, Shirley's ineffective assistance of counsel claims. Therefore, we affirm Shirley's conviction and sentence.

## I.　BACKGROUND

A federal grand jury returned a five-count indictment charging Shirley with conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349 (Count I), and honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 (Counts II through V). Shirley proceeded to trial. The Government adduced the following evidence at trial.

### A.　*Offense Conduct*

*Greenberg was elected as Seminole County Tax Collector and hired Shirley's company, Praetorian Integrated Services, LLC, as a consultant.*

In 2016, Greenberg successfully ran for Seminole County Tax Collector with Shirley serving as his campaign manager. Immediately after working on Greenberg's campaign, Shirley formed Praetorian Integrated Services, LLC ("Praetorian").

A few days into his term, Greenberg hired Praetorian as a consultant to the Seminole County Tax Collector's Office (the "Office"). The consulting contract provided that the Office would pay Praetorian a fee of $12,500 per month as well as fees and costs related to purchasing supplies and third-party services. The contract specified that Praetorian would provide services related to Greenberg's transition into the Office, "includ[ing], but not limited to, review and compilation of the office's budget, third party services, strategic planning along with implementation and execution, and technological review and guidance."

> *Shirley—using Ellicott as a middleman—paid Greenberg $6,000 as a bribe and kickback for the Praetorian contract.*

From January through September 2017, pursuant to the consulting contract, Praetorian sent the Office monthly invoices for its $12,500 fee, which was described as a "transition fee." The Office paid the invoices.

On September 25, 2017, Greenberg told his associate, Ellicott, that Shirley was lending Greenberg $6,000 because Greenberg was out of money. Greenberg asked Ellicott to pick up the money from Shirley. Ellicott met Shirley, who gave Ellicott $6,000 in an envelope. Shirley asked Ellicott to sign a contract that gave him a 10 percent stake in Ellicott's coin business in exchange for

$5,000. The contract provided that Ellicott was to return the $5,000 to Shirley in 24 months. Ellicott had reservations about signing the contract, but Shirley told him, "[I]t's not really a contract between us . . . . But Joel [Greenberg] and I have contracts together, and I'm loaning him this money. But in case somebody asks, I need to have . . . deniability, and this covers that." Ellicott signed the contract and delivered the $6,000 to Greenberg.

Three days later, Greenberg deposited a total of $6,020 in two of his personal checking accounts. He deposited $3,010 in one account and $3,010 in another account. Then he transferred $3,000 from one account to the other and made a $6,617.82 payment to his credit card. At trial, the Government contended that by adding $20 to the $6,000 and initially depositing the money into two different accounts, Greenberg was attempting to disguise the source of the $6,000.

> *From January 2017 to September 2019, the Office paid Praetorian over $450,000 in consulting fees and from invoice mark-ups for little, if any, legitimate services.*

In January 2017, Praetorian began working as a consultant to the Office pursuant to the consulting contract, purportedly providing various strategic management services, as required by the contract. However, Office employees and Ellicott testified that they rarely saw Shirley at the Office after the initial transition period, with one observing that she had no idea what Praetorian did for the Office. Two former part-time Praetorian employees testified that they did very little work for the Office themselves and did

not know what Praetorian did for the Office, even though the Office was Praetorian's only client. Nevertheless, Praetorian sent the Office monthly invoices for its $12,500 fee, which the Office promptly paid. On October 1, 2017, Praetorian sent the Office an invoice, which for the first time described its monthly fee as a "strategic management fee" instead of a "transition fee," as it had been described in prior invoices. Over time, because of pressing budgetary constraints, Greenberg cancelled some of the Office's other consulting contracts and reduced the fees of others. However, Greenberg never cancelled Praetorian's contract or reduced its consulting fee despite the fact it performed few, if any, meaningful services for the Office. The Office continued to pay all invoices for Praetorian's monthly fee through September 2019. In total, Praetorian received $412,500 in consulting fees from the Office. Nevertheless, as part of its "services" to the Office, Praetorian purchased supplies and services from third parties, for which Praetorian received additional compensation. When submitting invoices to the Office for those supplies and services, Praetorian added a mark-up to the purchase prices for itself. Ultimately, Praetorian received $43,990.72 from the mark-ups. An Office accountant testified that while retailers normally mark up their purchase prices when reselling products, such mark-ups are uncommon when consultants are paid a flat fee.

*After the Government started investigating Greenberg, Shirley and Ellicott met to discuss the $6,000 payment.*

By August 2019, the Government was investigating Greenberg for criminal offenses he allegedly committed while serving as tax collector. Subsequently, in September, Shirley and Ellicott met to discuss the investigation. Shirley told Ellicott not to worry about the $6,000 payment or coin business contract because Shirley and Greenberg would tell investigators that the $6,000 payment was covered by an invoice for office furniture that Shirley had taken from Greenberg's campaign office.

### B.    Trial Proceedings

*Ellicott's Testimony Against Shirley*

Ellicott testified that on September 25, 2017, Greenberg told Ellicott that Greenberg "needed a loan because he was out of money," "that he was going to get the loan from . . . Shirley," and that Greenberg needed Ellicott to pick up the money from Shirley. Shirley's counsel objected to this testimony on hearsay and Confrontation Clause grounds. The district court overruled the objections.

Ellicott testified that he now understands the $6,000 was a bribe and kickback from Shirley to Greenberg, but when he was first asked to pick up $6,000 from Shirley, he thought it was a loan. On direct examination, Ellicott acknowledged that he had pleaded guilty to honest services fraud and illegal distribution of Adderall. Ellicott testified that he agreed to cooperate with the Government,

and the Government agreed not to charge him with any other conduct related to those offenses. Ellicott also said he gave the Government information about the sex trafficking of a 17-year-old, for which he was not charged. Ellicott testified that it was during the course of the Government's prosecution of him and through his cooperation that he realized that the $6,000 payment was a bribe and kickback.

Shirley's counsel asked Ellicott if he had previously engaged in commercial sex with a minor. In response, Ellicott invoked his Fifth Amendment privilege against self-incrimination. Ultimately, Ellicott invoked his Fifth Amendment privilege over 60 times in response to questions about his involvement with a minor, his solicitation of sex from adult women, and his knowledge of Greenberg's involvement with a minor. When Shirley's counsel suggested that Ellicott was only saying that the $6,000 was a bribe or kickback to avoid sex trafficking charges, Ellicott invoked his Fifth Amendment privilege. Ellicott admitted that he never opened the envelope from Shirley with the $6,000 to confirm that it contained $6,000. Ellicott also testified about financial problems he was having when he was involved in the conspiracy.

After Ellicott's testimony, Shirley's counsel moved to strike Ellicott's testimony because Ellicott invoked his Fifth Amendment privilege against self-incrimination on material points regarding the significant benefit he received in his case. The district court de-

nied the motion because Shirley's counsel's cross-examination effectively made his point, and the district court did not see any prejudice.

*Motion for Judgment of Acquittal and Jury Instructions*

After the Government rested its case, Shirley's counsel moved for a judgment of acquittal on all counts. The district court denied the motion. Shirley's counsel rested his case without presenting any evidence.

The district court then discussed the proposed jury instructions. Both parties' proposed instructions, as initially submitted, provided that the first two elements of honest services fraud required the jury to find (1) that "the Defendant knowingly devised or participated in a scheme to fraudulently deprive the public of the right to honest services of the Defendant or a public official through bribery and kickbacks," and (2) that "the Defendant did so with an intent to defraud the public of the right to the honest services of the Defendant or a public official." Both parties agreed that "public official" meant "an officer or employee or person acting for or on behalf any department, agency or branch of government," including "[s]tate and local government." But the Government's proposed instruction had additional language: (1) "[a] 'public official' need not be an employee of the government agency," and (2) "[a] person who acts for or on behalf of the government agency pursuant to a contract or other business relationship can be a government 'public official,' just as an employee can be a 'public official.'" Shirley's counsel objected to the additional language on the

ground that it violated the Supreme Court's decisions in *Percoco v. United States*, 598 U.S. 319 (2023), and *Ciminelli v. United States*, 598 U.S. 306 (2023). The district court overruled Shirley's counsel's objection.

The Government then contended that the district court should remove the phrase "the Defendant or" from the jury instructions on the first two elements of honest services fraud discussed in the preceding paragraph. The Government contended that instead of saying that the jury had to find that Shirley "participated in a scheme to fraudulently deprive the public of the right to honest services of *the Defendant or a public official* through bribery and kickbacks," the instructions on the first two elements should simply say that the jury had to find that Shirley "participated in a scheme to fraudulently deprive the public of the right to honest services of *a public official* through bribery and kickbacks." Shirley's counsel objected and suggested that "a public official" be changed to "the public official[,]" arguing that the indictment clearly identified Greenberg as the only public official who accepted a bribe or kickback. The district court agreed to remove the phrase "the Defendant or" from the jury instructions, as the Government requested. However, the district court rejected Shirley's counsel's request to change "a public official" to "the public official"[1] because

---

[1] Therefore, the final jury instructions on the first two elements of honest services fraud were as follows: "The defendant can be found guilty of this crime only if all of the following facts are proved beyond a reasonable doubt: One, the defendant knowingly devised or participated in a scheme to fraudulently deprive the public of the right to honest services of a public official through

there was ample evidence that multiple people involved in the conspiracy, including Shirley and Ellicott, were public officials and because Shirley's counsel could argue in his closing argument that Greenberg was the only public official who solicited or accepted a bribe or kickback.

Shirley's counsel also asked the district court to instruct the jury that it could draw an adverse inference against Ellicott based on Ellicott's invocation of his privilege against self-incrimination. The district court refused to give the requested adverse inference instruction, determining that it did not apply in criminal cases.

*Closing Arguments*

The Government's theory in its closing argument was that Shirley paid Greenberg a bribe and kickback for the Praetorian contract. Shirley's counsel's theory was that Ellicott lied that the $6,000 was a bribe and kickback to avoid sex-trafficking charges and that the $6,000 was actually a loan to Ellicott, who was broke from spending all his money on sex. In its rebuttal to Shirley's closing argument, the Government suggested that Shirley could be a public official, stating that "Shirley works for a government agency, and he owes the public a duty of honest services." The Government also suggested that Shirley violated his "duty of honest services" by marking up Praetorian's purchase invoices for supplies and services from third parties, arguing that "[Shirley was] already

bribery or kickbacks; [and] two, the defendant did so with an intent to defraud the public of the right to the honest services of a public official . . ."

being paid for coordinating third-party services. He's sending invoices that are representing that these are legitimate and honest costs of the printing . . . . And it's a lie. It's not the price. That's why it's illegal."

Shirley's counsel then argued that the Government's position that Shirley was a public official that owed the public a duty of honest services first came up on rebuttal, which deprived Shirley of the chance to address the jury on that issue. Shirley's counsel did not ask the district court for an opportunity to address that issue with the jury. Shirley's counsel only requested that the district court instruct the jury that to find Shirley guilty of the substantive honest services fraud counts, they must find that Shirley received a bribe or kickback. The district court denied Shirley's counsel's request, finding that the Government's rebuttal did not require that additional instruction and that the jury instructions as finalized were appropriate.

*Sentencing*

The jury convicted Shirley on all five counts. In preparation for sentencing, the probation officer's Presentence Investigation Report ("PSI") calculated a base offense level of 14 for honest services fraud where the defendant was a public official, pursuant to Section 2C1.1(a)(1) of the United States Sentencing Guidelines ("U.S.S.G."). The probation officer's PSI increased that level by 14 under U.S.S.G. § 2C1.1(b)(2) based on a loss amount of $798,402.30, consisting of $492.411.60 in Praetorian's monthly consulting fees

and related invoices, $43,990.72 in profits from the marked-up invoices, and $262,000 related to Shirley's other relevant conduct. Shirley's counsel objected to the enhancements, arguing (1) that Shirley was not a public official under U.S.S.G § 2C1.1(a)(1), and (2) that the loss amount should not include the $412,500 monthly consulting fees since Shirley earned that money doing legitimate work. The district court overruled both objections.

The district court calculated a guideline range of 97 to 121 months. The district court varied downward and sentenced Shirley to 87 months' imprisonment as to Counts I through V, to be served concurrently, followed by two years of supervised release.

## II.    STANDARD OF REVIEW

We review *de novo* the sufficiency of evidence to support a conviction, viewing all evidence and drawing all inferences in the light most favorable to the government. *United States v. Langford*, 647 F.3d 1309, 1319 (11th Cir. 2011). We also review *de novo* the constructive amendment of an indictment claim, as well as the correctness of the jury instructions. *United States v. Mayweather*, 991 F.3d 1163, 1174 (11th Cir. 2021). However, we defer on questions of the instructions' phrasing and the refusal to give a requested jury instruction absent an abuse of discretion. *Id.* A district court's refusal to deliver a defendant's requested jury instruction "constitutes reversible error only if the instruction (1) is correct, (2) is not substantially covered by other instructions which were delivered, and (3) deals with some point so vital that the failure to give the requested instruction seriously impaired the defendant's ability to

defend." *Id.* at 1175 (quotation marks omitted) (quoting *United States v. Ruiz*, 59 F.3d 1151, 1154 (11th Cir. 1995)). Where trial counsel did not timely object and preserve an issue for appeal, we review only for plain error. *United States v. Iriele*, 977 F.3d 1155, 1176 (11th Cir. 2020).

We review evidentiary rulings for an abuse of discretion. *United States v. Hasner*, 340 F.3d 1261, 1274 (11th Cir. 2003). We also review for abuse of discretion a district court's ruling on a motion to strike witness testimony when the witness invokes his Fifth Amendment privilege against self-incrimination. *United States v. Ahmed*, 73 F.4th 1363, 1373 (11th Cir. 2023).

We review *de novo* the district court's interpretation and application of the sentencing guidelines. *United States v. Campbell*, 765 F.3d 1291, 1301 (11th Cir. 2014). We review for clear error the sentencing court's factual findings. *Id.*

We review an ineffective-assistance-of-counsel claim *de novo*, *Nixon v. Newsome*, 888 F.2d 112, 115 (11th Cir.1989), *rev'd on other grounds*, 888 F.2d 112 (11th Cir. 1989), but "will not generally consider claims of ineffective assistance of counsel raised on direct appeal where the district court did not entertain the claim nor develop a factual record." *United States v. Bender*, 290 F.3d 1279, 1284 (11th Cir. 2002).

## III.    DISCUSSION

We address the issues on appeal sequentially. First, we address the sufficiency of the evidence. Second, we address Shirley's

challenges to the district court's jury instructions. Third, we address Shirley's evidentiary challenges. Fourth, we address whether the district court erred in calculating Shirley's base offense level and loss amount. However, we decline to address Shirley's ineffective assistance of counsel claims.

### A.    Sufficiency of the Evidence

Shirley contends that there is insufficient evidence to support his convictions. Shirley challenges his conviction for conspiracy on the ground that there was insufficient evidence of an agreement between Shirley and Greenberg. Shirley argues (1) that the Government did not present a witness who could testify about a conversation where Greenberg and Shirley expressly agreed to commit honest services fraud and (2) that the consulting contract was not evidence of a conspiracy because there was nothing improper about the contract. Shirley also challenges the sufficiency of the evidence for the four substantive charges of honest services fraud on the ground that the Government did not show that Shirley paid Greenberg $6,000 in exchange for an official action. Shirley contends that the Government did not show (1) that Shirley actually paid any money to Greenberg since Ellicott testified that he did not open the envelope which purportedly contained $6,000 inside or (2) that the money Greenberg deposited in the bank was money he received from Shirley. Shirley argues that the evidence, at most, only showed that he paid Greenberg an unlawful gratuity, not a bribe and kickback, because Shirley did not pay Greenberg the $6,000 until long after the Office hired Praetorian.

To succeed on his claim, Shirley must establish that, viewing the evidence and drawing all inferences in favor of the Government, no reasonable jury could have convicted him. *United States v. Silvestri*, 409 F.3d 1311, 1327 (11th Cir. 2005). Viewing the evidence in that light, we find there is sufficient evidence to support Shirley's convictions on all counts. Regarding the conviction for conspiracy, a reasonable jury could have inferred that Greenberg and Shirley conspired to commit honest services fraud based on the evidence (1) that Greenberg hired Praetorian with a lucrative contract, continued to employ its services despite the fact that Praetorian performed few, if any, legitimate services for the Office, and kept the Praetorian contract in place when other consulting contracts were eliminated or reduced for budgetary reasons, (2) that Shirley paid Greenberg $6,000 while working for the Office, (3) that Shirley attempted to conceal this payment by entering into a fake contract for an interest in Ellicott's coin business and by later telling Ellicott that Shirley and Greenberg would say the money was for furniture that Shirley had taken from Greenberg's campaign office, and (4) that Greenberg also attempted to conceal the source of the payment by dividing the $6,000 into two $3,000 deposits, adding $10 to each, and depositing the funds into two separate bank accounts. *See United States v. Aunspaugh*, 792 F.3d 1302, 1306–07 (11th Cir. 2015) (finding sufficient evidence supporting conviction for conspiracy to commit honest services fraud when owners of company paid kickbacks to public official for entering into a lucrative contract with company and continuing to favor company over other subcontractors); *see also United States v. McNair*, 605 F.3d 1152,

1197 (11th Cir. 2010) (stating that "the extent to which the parties went to conceal their bribes is powerful evidence of their corrupt intent").

That the Government did not present a witness who could testify about a conversation between Greenberg and Shirley in which they expressly agreed to commit honest services fraud does not mean that the evidence was insufficient because there was ample circumstantial evidence from which the jury could reasonably infer the existence of a conspiracy. *See Langford*, 647 F.3d at 1319 ("[C]ircumstantial evidence may be used to establish an element of a crime, even if the jury could draw more than one reasonable inference from the circumstantial evidence, and in judging sufficiency of the evidence, we apply the same standard whether the evidence is direct or circumstantial."); *see also United States v. Sosa*, 777 F.3d 1279, 1290 (11th Cir. 2015) ("[T]he very nature of conspiracy frequently requires that the existence of an agreement be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." (quoting *United States v. Vernon*, 723 F.3d 1234, 1273 (11th Cir.2013)). Shirley's argument that Praetorian's consulting contract was not evidence of the conspiracy because it was not improper also fails because based on the evidence, a reasonable jury could have found that the consulting contract was not a legitimate arms-length agreement but rather a sweetheart deal that simply furthered Shirley and Greenberg's scheme.

Regarding Shirley's convictions on the four counts of honest services fraud, a jury could have reasonably inferred that the $6,000 was a bribe and kickback in exchange for an official act based on the evidence (1) that the consulting contract was a very lucrative arrangement under which Praetorian performed little, if any, legitimate consulting services, (2) that after Shirley gave Ellicott the $6,000, Praetorian changed its invoices for its monthly $12,500 fee to reflect that the fee was a "strategic management" fee instead of the original "transition fee," and (3) that Greenberg did not cancel the contract after the transition period was over, even as the budget-challenged Office had to cancel or reduce other contracts and even though Praetorian continued to perform few, if any, legitimate services for the Office. The Government did not need to present direct evidence that Ellicott saw the $6,000 or that the money Greenberg deposited was the $6,000 from Shirley for the jury to reasonably infer that Shirley committed honest services fraud. Shirley's argument that Shirley did not pay Greenberg $6,000 until long after the Office hired Praetorian also fails because the evidence supported a reasonable inference that the $6,000 was paid in exchange for an official act: not only entering into the consulting contract but also keeping it in place beyond the transition period despite the Office's budgetary constraints.

For these reasons, we reject Shirley's challenges to the sufficiency of the evidence.

### B.        Challenges to Jury Instructions

*Constructive Amendment of the Indictment*

Shirley argues that the indictment was constructively amended by the definition of "public official" in the jury instructions, which provided that "[a] public official need not be an employee of the government agency" and that "[a] person who acts for or on behalf of the government agency pursuant to a contract or other business relationship can be a government 'public official,' just as an employee can be a 'public official.'" Shirley also argues that the Government fundamentally changed its trial theory by suggesting that Shirley was a public official when the Government stated in its rebuttal to Shirley's counsel's closing argument that "Shirley works for a government agency, and he owes the public a duty of honest services"[2] and that Shirley violated his duty to provide honest services by marking up Praetorian's purchase invoices for supplies and services from third parties.

The Fifth Amendment prevents the government from trying a defendant "on charges that are not made in the indictment

---

[2] Shirley also argues that the Government's statements in its rebuttal to Shirley's counsel's closing argument that "all of the overwhelming evidence . . . suggests to you that Mr. Shirley is guilty of honest services [fraud]" and "Mr. Shirley did not provide honest services" further show that the Government fundamentally changed its trial theory on rebuttal. However, these two statements were made by the Government in its initial closing argument, not its rebuttal. In addition, these statements simply emphasize that Shirley was guilty of committing honest services fraud, a crime for which he was charged in the indictment.

20                    Opinion of the Court                    24-10672

against him" or to be convicted on theories that the indictment "cannot fairly be read as charging[.]" *Stirone v. United States*, 361 U.S. 212, 217 (1960); *see* U.S. Const. amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury[.]"). A constructive amendment occurs when an essential element of a charged offense is altered to broaden the possible bases for conviction beyond those contained in the indictment. *United States v. Baldwin*, 774 F.3d 711, 724 (11th Cir. 2014). An indictment can be constructively amended by the government's argument or through the district court's jury instructions. *United States v. Zayas*, 141 F.4th 1217, 1225–26 (11th Cir. 2025). Constructive amendments to an indictment are reversible error per se. *United States v. Behety*, 32 F.3d 503, 508 (11th Cir.1994). To determine whether a constructive amendment occurred, we assess the district court's instructions or government's argument "in context" to see whether the indictment was expanded either literally or in effect. *Id.* at 508–09.

We find that neither the jury instructions nor the Government's argument constructively amended the indictment. While the jury instructions did provide that a public official "need not be an employee of the government," when considered "in context" with all of the evidence in the trial, the instructions as a whole did not allow the jury to convict Shirley on the theory that he, rather than Greenberg, was the public official that defrauded the public of honest services because the instructions made clear that the public official had to solicit or accept a bribe or kickback. The Government's theory throughout the trial was that Greenberg was the

public official who solicited or accepted a bribe or kickback, and all the evidence presented at trial was devoted to proving this theory. The Government never contended nor offered evidence that Shirley received or solicited a bribe or kickback in exchange for his official action. Indeed, that would have been inconsistent with the Government's case. And while the Government did argue that the invoice mark-ups, which Praetorian added to its purchase prices for supplies and services from third parties, were improper, the Government did not argue these were bribes or kickbacks given to Shirley. Further, reading the Government's argument in rebuttal in this context suggests that a reasonable interpretation of the Government's arguments was that it was simply emphasizing that the consulting contract, including the marked-up invoices, was an illegal lucrative agreement under which Shirley, through Praetorian, provided little or no "honest services" to the Office. Moreover, at most, the Government's comments would have caused a nonprejudicial ambiguity for the jurors, which does not amount to a constructive amendment of the indictment, given the context of the trial evidence and the jury instructions. *See id.* at 509 (finding government's statement in closing argument arguably advancing theory different from that in indictment was not constructive amendment when government's entire theory at trial was same as that in indictment).

### Violation of Supreme Court Precedent

Shirley challenges the jury instruction's definition of "public official" on the grounds that (1) it was erroneous and overbroad in

light of the Supreme Court's decision in *Percoco v. United States*, 598 U.S. 319 (2023), and (2) it ran the risk of expanding federal criminal jurisdiction to breach-of-contract cases traditionally left to the states in defiance of *Ciminelli v. United States*, 598 U.S. 306 (2023). "[D]istrict courts have broad discretion in formulating jury instructions provided that the charge as a whole accurately reflects the law and the facts," and we will not reverse a conviction based on a jury charge unless "the issues of law were presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process." *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000) (quoting *United States v. Arias*, 984 F.2d 1139, 1143 (11th Cir.1993)).

Here, the jury instruction's definition of "public official" was not erroneous, overbroad, or unconstitutionally vague as applied to Shirley and did not expand federal criminal jurisdiction beyond the text of the statute in violation of *Ciminelli*. Even if the jury could have found that Shirley fell within the instructions' definition of "public official," the instructions as a whole did not allow the jury to convict Shirley on the theory that he, rather than Greenberg, was the public official that defrauded the public of honest services because the instructions as a whole made clear that anyone who falls within its definition of "public official" still must accept or solicit a bribe or kickback to fall within § 1346's proscription. We conclude that the definition of "public official," as used here, did not violate *Percoco* or *Ciminelli*.

*District Court's Failure to Give Unlawful Gratuity Instruction*

For the first time on appeal, Shirley argues that the district court erred by *sua sponte* failing to instruct the jury regarding the lesser offense of paying an unlawful gratuity. We review Shirley's claim for plain error. *See Iriele*, 977 F.3d at 1176.

We have not addressed whether paying an unlawful gratuity is a lesser included offense of honest services fraud. Assuming that it is, we have previously held that where a defendant fails to request a jury instruction on a lesser included offense and fails to object to the omission of such an instruction, it is not plain error for a district court to fail to *sua sponte* give such an instruction. See *United States v. Chandler*, 996 F.2d 1073, 1099 (11th Cir.1993). Therefore, Shirley has not shown that a plain error occurred.

*Request for Adverse Inference Jury Instruction*

Shirley also contends that the district court erred by failing to instruct the jury that it could make an adverse inference against Ellicott's invocation of his Fifth Amendment privilege against self-incrimination in response to questions regarding his involvement in sex trafficking.

As indicated above, a district court's refusal to deliver a defendant's requested jury instruction constitutes reversible error only if the instruction is legally correct on a point not substantially

covered by the other instructions and so vital that refusing to de-
liver the instruction would seriously impair the defendant's ability
to defend. *Mayweather*, 991 at 1175.

Shirley's requested instruction fails on all three prongs. We
have previously held that the trier of fact may take an adverse in-
ference against a witness who invokes their Fifth Amendment priv-
ilege against self-incrimination in a *civil* action. *Coquina Invs. v. TD
Bank, N.A.*, 760 F.3d 1300, 1311 (11th Cir. 2014). But in criminal cases,
"[n]either side has the right to benefit from any inferences the jury may
draw simply from the witness's assertion of the [Fifth Amendment] priv-
ilege either alone or in conjunction with questions that have been put to
him." *United States v. Lacouture*, 495 F.2d 1237, 1240 (5th Cir. 1974).[3]
That is because "reliable inferences from such conduct by a witness
do not ordinarily follow." *Id.* Therefore, we find that Shirley's re-
quested instruction was inappropriate. The requested instruction
was also substantially covered by other instructions to the jury, in-
cluding the instructions (1) that they should ask themselves
whether a witness had any particular reason not to tell the truth,
(2) to consider the fact that a witness has been convicted of a felony
in deciding whether to believe a witness, and (3) that an accomplice
witness like Ellicott who hopes to gain more favorable treatment
may have a reason to make a false statement in order to strike a

---

[3] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc)
(holding that all decisions of the "old Fifth" Circuit handed down prior to the
close of business on September 30, 1981, are binding precedent in the Eleventh
Circuit).

good bargain with the Government. The requested instruction also did not deal with a point so vital that failure to give the requested instruction seriously impaired Shirley's ability to defend himself since Ellicott only invoked his Fifth Amendment privilege in response to questions that bore on collateral issues like his credibility. In addition, as indicated above, Ellicott invoked his Fifth Amendment privilege over 60 times. We agree with the district court that Shirley's counsel effectively made his point, and his client was not prejudiced.

For these reasons, we find that the district court did not abuse its discretion in refusing to give Shirley's proposed adverse inference instruction.

### C. Evidentiary Challenges

*Hearsay Challenge to Admission of Greenberg's Statements to Ellicott*

Shirley challenges the trial court's admission of Ellicott's testimony regarding Greenberg's statements to Ellicott that Greenberg "needed a loan because he was out of money," that Greenberg "was going to get the loan from . . . Shirley," and that Greenberg "needed [Ellicott] to go pick it up" on the grounds that they are hearsay or, in the alternative, that no foundation for their admission under the co-conspirator exclusion to the hearsay rule was established.

Hearsay is defined as a statement, other than one made by a declarant while testifying at trial, offered in evidence to prove the

truth of the matter asserted. However, statements of co-conspirators made during the course and in furtherance of the conspiracy are not hearsay if the government proves the existence of a conspiracy between the defendant and the hearsay declarant by a preponderance of the evidence. *Hasner*, 340 F.3d at 1274. We find that Greenberg's statements to Ellicott were properly admitted under the co-conspirator exclusion to the hearsay rule because, prior to the admission of Greenberg's statements to Ellicott, the Government presented sufficient evidence to prove by a preponderance of the evidence that a conspiracy existed between Shirley and Greenberg. *See* Fed. R. Evid. 801(d)(2)(E).

### Confrontation Clause Challenge to Greenberg's Statements to Ellicott

Shirley further argues that admission of these statements violated his Confrontation Clause rights. The Sixth Amendment guarantees a defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. This prohibits the introduction of a witness's testimonial statements. *Crawford v. Washington*, 541 U.S. 36, 53 (2004); *see also United States v. Caraballo*, 595 F.3d 1214, 1227 (11th Cir. 2010). A statement is testimonial when its "primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006). "Statements in furtherance of a conspiracy" are "by their nature [ ] not testimonial." *United States v. Holland*, 117 F.4th 1352, 1359 (11th Cir. 2024). Here, even if Green-

berg's statements to Ellicott were hearsay, they were not testimonial because their primary purpose was not to establish past events relevant to later criminal prosecution. Rather, they were statements made in furtherance of the conspiracy. Thus, the admission of the statements did not violate Shirley's Confrontation Clause rights.

### Challenge to District Court's Denial of Motion to Strike

Shirley also challenges the district court's denial of his motion to strike Ellicott's testimony after Ellicott invoked his privilege against self-incrimination as to the underlying facts surrounding his involvement in sex trafficking, arguing that Ellicott's refusal to answer questions violated Shirley's Sixth Amendment right to confront witnesses through full cross-examination.

If a witness invokes his privilege against self-incrimination during cross-examination, "all or part of that witness's direct testimony may be subject to a motion to strike." *Fountain v. United States*, 384 F.2d 624, 628 (5th Cir. 1967). The ultimate inquiry is whether the defendant has been deprived of "the ability to test the truth of the witness's direct testimony." *Id.*; *see also United States v. Darwin*, 757 F.2d 1193, 1203 (11th Cir. 1985). Invoking the privilege as to collateral matters does not require the striking of direct testimony but invoking it as to direct matters does. *United States v. Hirst*, 668 F.2d 1180, 1183 (11th Cir. 1982).

The district court did not abuse its discretion by declining to strike Ellicott's testimony because Ellicott invoked his privilege against self-incrimination only as to collateral matters on direct: his

credibility and his motive to cooperate with the Government. *See id.* (declining to strike testimony when invocation related to collateral matters dealing with the witness's credibility). Shirley's counsel's cross-examination fairly allowed him to test Ellicott's credibility by asking him about the fact that Ellicott cooperated in a sex-trafficking case and the benefits he received from his cooperation. So, there was no need for Shirley to explore the underlying facts of the sex trafficking cases, questions about which Ellicott refused to answer.

Nor did Ellicott's invocation of his privilege against self-incrimination violate Shirley's right to confront witnesses because it did not deprive Shirley of the ability to support his theories of defense, namely that Ellicott lied about the $6,000 being a bribe or kickback, that the $6,000 was actually a loan from Shirley to Ellicott, and that Ellicott only implicated Shirley in the offense to avoid prosecution for sex-trafficking. Ellicott testified about the benefits he received from his cooperation, and he admitted that he came to realize that the $6,000 was a bribe or kickback from the Government's prosecution of him for honest services fraud. Ellicott also testified about prior instances where he needed to borrow money from Shirley. Shirley's counsel also cross-examined Ellicott about whether his meeting with Shirley in September 2019 was in fact a meeting to repay the $5,000 pursuant to the coin business contract, not a meeting to discuss the Government's investigation into Greenberg. These questions all allowed Shirley to test the truth of Ellicott's direct testimony.

For these reasons, Shirley was not deprived of his Sixth Amendment right to confront Ellicott by virtue of his invocation of his privilege against self-incrimination. Therefore, we find that the district court did not abuse its discretion by declining to strike Ellicott's testimony.

### D.    Sentencing Issues

Shirley challenges the district court's calculation of his base offense level, arguing that the district court erred in applying the enhancement in U.S.S.G. § 2C1.1(a)(l) for defendants who are public officials because he was merely an independent contractor, not a government employee, and thus was not a public official. Shirley also argues that the district court erred in including Praetorian's monthly consulting fees in the loss amount calculation, because those fees were legitimately earned. We reject both arguments.

*Base Offense Level*

The base offense level under U.S.S.G. § 2C1.1, which addresses offenses including honest services fraud, is 12 unless the defendant is a public official, in which case it is 14. U.S.S.G. § 2C1.1(a). The Sentencing Guidelines state that the term "public official" "shall be construed broadly[,]" *id.*, comment. (n.1), and that the term includes in relevant part:

> An officer or employee or person acting for or on behalf of a state or local government, or any department, agency, or branch of government thereof, in any official function, under or by authority of such

department, agency, or branch of government, or a
juror in a state or local trial.

*Id.*

Here, the district court did not clearly err in applying the base offense level of 14 for defendants who are public officials. Shirley's asserted independent-contractor status is irrelevant to determine whether he qualifies as a public official for sentencing because the application notes for U.S.S.G. § 2C1.1 explain that a "public official" need not be an "officer or employee." *See id.* Instead, Shirley's public-official status depends on his responsibilities and actions with respect to the Office even as an independent contractor. *See id.* As part of Praetorian's responsibilities for the Office, Shirley, through Praetorian, purportedly provided services related to Greenberg's transition into the Office. These included strategic planning, implementing and executing those plans, as well as providing technological review and guidance. In addition, Praetorian purchased substantial supplies and services from third parties, thereby effectively deciding how the Office would spend over $220,000 of its funds. Therefore, given that the term "public official" should be construed broadly and focus on whether Shirley was acting on behalf of a government body under that body's authority, in an official capacity, the district court did not clearly err in determining that Shirley was a public official for purposes of U.S.S.G. § 2C1.1(a).

*Loss Amount*

Under U.S.S.G. § 2B1.1(b)(l)(H)–(I), a defendant is subject to a 14-level enhancement if his offense results in a loss amount of more than $550,000 and less than $1,500,000. The Government has the burden to prove the losses attributed to the defendant by a preponderance of the evidence. *United States v. Cavallo*, 790 F.3d 1202, 1232 (11th Cir. 2015). The Sentencing Guidelines do not require a precise determination of loss, only "a reasonable estimate of the loss, given the available information." *Id.* (quoting *United States v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011)).

The district court did not clearly err by including the $412,500 in monthly consulting fees in the loss amount. Where a defendant's conduct "was permeated with fraud, a district court does not err by treating the amount that was transferred from the victim to the fraudulent enterprise as the starting point for calculating the victim's pecuniary harm." *Campbell*, 765 F.3d at 1305. The evidence at trial demonstrated that Shirley's conduct with the Office was permeated with fraud. Immediately after working on Greenberg's election campaign, Shirley formed Praetorian and entered into a lucrative consulting contract with the Office, Praetorian's sole client. As Praetorian, however, Shirley either delegated or disregarded its contractual responsibilities. In September 2017, Shirley purportedly paid Greenberg a $6,000 bribe to keep Praetorian's contract in place even though the Office's transition period was over. The Office maintained the Praetorian contract through September 2019 even though the Office had previously cancelled

or reduced other consulting contracts due to tight budgetary con-
straints and even though Praetorian performed few, if any, legiti-
mate services for the Office. Given these facts, the district court did
not err by including the $412,500 in monthly consulting fees in its
starting point for calculating the loss amount.

Once that starting point for calculating the Office's loss was
established, the burden shifted to Shirley to show that Praetorian
provided any legitimate value to the Office. *See United States v. Maz-
kouri*, 945 F.3d 293, 304 (5th Cir. 2019); *see also United States v. Al-
phas*, 785 F.3d 775, 784 (1st Cir. 2015) (finding that where defend-
ant's claims are "demonstrably rife with fraud," the burden of pro-
duction shifts to defendant, "who must offer evidence to show (if
possible) what amounts represent the legitimate claims"). Shirley
did not meet his burden. The only identifiable evidence showed
that the only meaningful service Praetorian performed for the Of-
fice was purchasing supplies and services from third parties, for
which Shirley submitted inflated invoices to the Office. In the ab-
sence of evidence from Shirley that Praetorian provided any legiti-
mate value to the Office, the district court may reasonably include
the full amount of unearned consulting fees in the intended loss.
Therefore, the district court did not clearly err in including the
$412,500 from the monthly consulting fees in the loss amount. *See
Mazkouri*, 945 F.3d at 304.

### E.    *Ineffective Assistance of Counsel Claims*

Shirley also argues for the first time on appeal that his trial counsel was ineffective for three reasons: (1) failing to object to several leading questions that the Government asked Ellicott, (2) failing to move for acquittal on the ground that the evidence introduced at trial could only have supported a conviction for the lesser included offense of paying an unlawful gratuity, not honest services fraud, and (3) failing to argue for a jury instruction on the offense of paying an unlawful gratuity.

We find that the record is not sufficiently developed for us to consider Shirley's claims. *See Bender*, 290 F.3d at 1284. That is because the record does not reflect counsel's strategic reasoning for making his decisions during trial. In such a case, "the preferred means for deciding [these ineffective assistance of counsel claims] is through a 28 U.S.C. § 2255 motion." *See United States v. Patterson*, 595 F.3d 1324, 1328 (11th Cir. 2010). Therefore, we decline to consider Shirley's ineffective assistance of counsel claims at this time.

## IV.    CONCLUSION

We **AFFIRM** Shirley's conviction and sentence.